**CROSKEY STREET CONCERNED CITIZENS, Lyra Fortune, on her own behalf and on behalf of others similarly situated, Appellants,**

**Resident Advisory Board of Philadelphia, (Intervening Plaintiff),**

v.

**George ROMNEY, Secretary of Housing and Urban Development, et al.**

**No. 71-2129.**

United States Court of Appeals, Third Circuit.

Argued March 10, 1972.

Decided April 25, 1972.

Edwin D. Wolf, Lawyers Committee for Civil Rights Under Law, Philadelphia, Pa., for appellants.

Robert J. Sugarman, Dechert, Price & Rhoads, Philadelphia, Pa., for intervening plaintiff.

Walter S. Batty, Jr., Asst. U. S. Atty., Philadelphia, Pa., for Federal appellees.

Joseph Mistrano, Philadelphia, Pa., for appellee, Philadelphia Housing Authority.

Arthur R. Littleton, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee, Tollin Graboyes Co.

Before McLAUGHLIN, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

McLAUGHLIN, Circuit Judge.

In this appeal the sole question now before us is whether the district court, 335 F.Supp. 1251, abused its discretion in refusing to issue a preliminary injunction against the defendants from proceeding with the construction of the Croskey Street North Philadelphia low rent housing project for the elderly and for federal assistance to it. However, along the way there must be some brief exposition so that the result here will be understandable.

Admittedly low rent housing for the elderly is badly needed in the areas involved and in Philadelphia generally. The theory advanced in the contention offered against this new construction is that it will increase the already heavy black population of the Croskey Street neighborhood. Actually in the H.U.D. plan the first four buildings comprise a total of 313 units which will be occupied largely by low income elderly persons and located in an area predominated by blacks. The fifth structure "Washington Square West" will have 360 units in what is predominantly a white or racially mixed area. The approval by H.U.D. of all this related housing is based upon what H.U.D. contends is a carefully balanced program fair to all of the Philadelphia citizens concerned, with H.U.D. recognizing the importance of the whole project to those people. H.U.D argues and represents that it has been and is a fundamental H.U.D. policy to make sure that this practice is fully performed by the Philadelphia Housing Authority and that through meticulous checking and rechecking, H.U.D. is satisfied that Philadelphia will live up to its commitment in this instance. Were it otherwise H. U.D.'s policy would be to cut off all further funds until an acceptable balancing project is built.

It should be noted here that H.U.D. says plainly that it accepts and is in full accord as far as it is relevant with the decision of this court in Shannon v. H. U.D., 436 F.2d 809 (1970). H.U.D. submits that its judgment in this litigation shows itself to be an informed one and that it thoroughly understands the area needs of low cost housing for the elderly. It realizes that the prime necessity for that might ordinarily outweigh the disadvantage of increasing racial concentration. But even so, it has lived up to its own regulations in insisting that the housing before us provides a balanced racial distribution.

H.U.D. clearly states that it recognizes the importance of this housing to the people affected. We need not pass on the merits of these assertions at this preliminary stage.

In this case the main plaintiff, Mrs. Fortune, is a fine neighborhood leader who is entitled to and is receiving the highest consideration for herself and all of the people she represents. As a witness she denied that their objection to the project had any racial implications. She properly and very clearly stated that she did not feel that there were too many black people and not enough white people living in her area. She did testi-

fy that her objection to the project was because "I think that it is too many of the same income bracket in the area, wherein we could have some with a higher income." The two sites that Mrs. Fortune likes are also in the North Philadelphia zone (where the Croskey building will be situated) which her attorney considers to be 95% black.

The Resident Advisory Board of Philadelphia, representing the public housing Philadelphia tenants and prospective tenants, was allowed by the district court to intervene as plaintiff. It has not appealed from the decision of the district court denying application of the other appellants to preliminarily enjoin the construction of the North Croskey Street housing.

It is self evident that the appellants asking for a preliminary injunction have completely failed to show that they will be irreparably harmed by the erection and stated use of the said building. They have not shown that the more than two thousand elderly persons waiting patiently for low income housing would not be grievously injured by the lack of the availability of this project. Up to now at least the effort to discard the H.U.D. plan to alleviate the shortage of low income elderly housing in Philadelphia is patently against the public interest.

Finally, we are not persuaded that appellants, on the basis of the preliminary record, have made a strong showing that they are likely to prevail on the merits at final hearing. Only very persuasive countervailing considerations should interfere with this H.U.D. attempt to help obtain decent low rent homes for a goodly number of Philadelphia's elderly who need them badly.

The judgment of the district court will be affirmed.

ALDISERT, Circuit Judge (concurring).

While I join in the opinion of the court, I offer these additional observations. Today this court limits its decision to the extremely narrow issue of whether the district court abused its discretion in refusing the request for a preliminary injunction.

Ours is an appellate, not a trial, court. And an appellate court has no authority to grant or to refuse a preliminary injunction. "It is to the discretion of the trial court and not to the appellate court, that the law has intrusted the power * * * to grant or dissolve an injunction, and the only question for an appellate court is: Does the proof clearly establish an abuse of that discretion by the trial court * * * for unless such abuse is clearly established, or an obvious error has occurred in the application of the law, or a serious and important mistake has been made in the consideration of the proof, the judgment of the trial court must be taken as presumptively correct." Stokes v. Williams, 226 F. 148 (3 Cir. 1915), cert. denied 241 U.S. 681, 36 S.Ct. 728, 60 L.Ed. 1234.

Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F.2d 506, 527 (3d Cir. 1969) (Dissenting Opinion). "This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district judge; only a clear abuse of his discretion will justify appellate reversal." United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970); United States v. Ingersoll-Rand Co., 320 F.2d 509, 523 (3rd Cir. 1963).

The leading case of Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), sets forth standards, which though promulgated for guidance in considering an application for a stay pending an appeal, constitute, in my view, practical guidelines for use by an

appellate court in reviewing a denial of a preliminary injunction request of this nature:

1. Did the plaintiff make a strong showing that it is likely to prevail on the merits?

2. Did the plaintiff show that without such relief, it will be irreparably injured?

3. Would the grant of a preliminary injunction substantially have harmed other parties interested in the proceedings?

4. Where lies the public interest?

The best case made by the appellant in the district court was the argument that although H.U.D. had allegedly considered the project's impact upon the racial concentration in the area and had made specific findings thereon, and had purportedly addressed itself to the relevant factors set forth in Shannon v. H.U.D., 436 F.2d 809, 821–822 (3d Cir. 1970), necessary to arrive at an informed judgment, H.U.D. nevertheless failed to adopt "some institutionalized method" for consideration of these factors. Thus, appellants' criticism of H.U.D. is one of form, and not substance.

In holding that plaintiffs are not entitled to a preliminary injunction, neither the trial court nor the opinion of this court forecloses the full development of the Shannon issue by appellants at the final hearing, although, admittedly, the stridency of appellants' contention suggests that they believe it is not necessary to add more to the record. I fear that appellants have placed an undue emphasis on the Shannon argument at this time. Indeed, aside from its relation to the public interest, the argument has relevancy only to whether appellants have made a "strong showing" that they will prevail. As stated in North Atlantic Westbound Freight Ass'n v. Fed. Mar. Commission, 130 U.S.App.D.C. 122, 397 F.2d 683, 684–685 (1968), "[a] movant for stay must demonstrate that the case presents more than a close question; it must make 'a strong showing that it is likely to prevail on the merits of its appeal.' "

I have addressed myself to Shannon only because appellants have concentrated so much of their energies—by petition for an emergency stay, for an accelerated disposition of this appeal, by brief and by oral argument—to this point. And I believe they have missed their mark completely, for they have not fully appreciated the very important distinction between a request for interlocutory relief before final hearing, (including the necessity for bond, Fed.R.C.P. 65(c)), and permanent injunctive relief. Irrespective of the force of the Shannon argument, the reality is that in the context of a preliminary injunction, appellants were required to, and failed to give convincing answers to these considerations:

1. How they will be irreparably injured by the failure of the district court to enjoin pendente lite construction of this housing for the elderly.

2. Would there be substantial harm to other parties interested in the proceedings?

It is difficult to fit appellants into a precise mold in terms of an orthodox plaintiff relationship in an injunction proceeding. Because the issue was not briefed or argued before us, I have assumed plaintiffs have standing, although I suggest that the question is not free from doubt. As delineated in the court's opinion, the class representative testified that she preferred the housing be located at two other sites in Philadelphia, conceded to be 95% black in racial composition. Applying the "injury in fact" test in Shannon we found the test satisfied in an allegation that "concentration of lower income black residents . . . in their neighborhood will adversely affect not only their investments in homes and businesses, but even the very quality of their daily lives." 436 F.2d at 818. I am not at all certain that the Shannon standing test was satisfied here, because although the Croskey Street location is a

95% black area, the sites desired by Mrs. Fortune have the identical racial composition percentage.

We have previously held that a class representative must "show injury to himself in order to seek judicial relief," that a predicate to the right to represent a class "is his eligibility to sue in his own right." Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 734 (3d Cir. 1970). From this it follows that where, as here, preliminary injunctive relief is demanded, the plaintiffs have the burden of proving the *sine qua non* of this emergency remedy—irreparable injury *to them* if the relief sought is not granted. Although the class action is designed to avoid multiplicity of litigation, there is nothing in this procedural device that confers upon a class or its representative the privilege of emergency equitable relief not available to an individual suing in his own right.

Upon an independent review of the record, I do not find irreparable harm to appellants, and on this basis alone, I would hold that the district court did not abuse its discretion in refusing to grant a preliminary injunction. United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, *supra.* Indeed, because of the limited nature of the attack launched by appellants in these proceedings, I foresee some difficulty in ultimately establishing entitlement to permanent injunctive relief without proof of harm to them *qua* plaintiffs. Moreover, the question of entitlement to declaratory relief is no longer free from doubt. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L. Ed.2d 688 (1971).

An additional ground for sustaining the district court is the very real potential for harm to other parties interested in these proceedings. To state the potential of harm to the private developer because of construction delay or abandonment of the project is to acknowledge the obvious. But there is an even more sinister potential for harm. The record demonstrates the critical need for public housing for the elderly in the City of Philadelphia and in the Croskey Street area. Depriving the elderly of this facility, or even delaying access thereto, is to me an important, if not the most important, consideration of these entire proceedings. I am not at all convinced that the peculiar interests of the elderly are properly represented by the plaintiff class or by the intervenor, whose private and personal causes entail broader considerations which may, at least in these proceedings, directly conflict with the immediate interests of the potential residents of the Croskey project.

This conflict lays bare the heart of the problems inherent in this type of litigation, where private citizens, idealistically motivated and superbly endowed with legal counsel who are talented, resourceful, persevering and of seemingly unlimited financial resources, choose to represent the public interest in a challenge to those decisions made by administrative agencies charged by law to protect that same public interest. Thus, "the public interest," like beauty, becomes that viewed in the eye of the beholder.

The aims and objectives of the plaintiffs and the intervenor here, although noteworthy and laudable, nevertheless constitute a severely restricted emphasis on the desire that public housing not be limited to the black areas of Philadelphia and be so located as to offer black residents a full range of housing opportunity, including opportunities in racially integrated communities. The day is long past to quarrel with the desirability of such an objective, consistent as it is with the public interest.

We must recognize, however, the risk of denying fulfillment of that aspect of the same public interest which seeks to lift the elderly, and lift them immediately, from the physical and psychological blight of inadequate and inappropriate, if not substandard and squalid, housing. And in these proceedings—which would frustrate fulfillment of the latter in order to vindicate the former—the necessi-

ty that a path of caution be trod is manifest; the elderly, the group ultimately affected by the outcome of this litigation, are the one sector of the public whose interests are not the subjects of special representation in these proceedings.

Thus, in this matter, inexorably concerned with the public interest, we see competing defenders of this same interest: (1) the defendants who are *de jure* public guardians, the executive branch of the federal government in the person of officials of the Department of Housing and Urban Development, and the Philadelphia Public Housing Authority; (2) the plaintiffs who have volunteered to vindicate public rights; (3) the Lawyers' Committee for Civil Rights Under Law, legal counsel for plaintiffs; (4) a corporation describing itself as "the officially recognized class representative of persons eligible for low income public housing in Philadelphia," the intervening "Resident Advisory Board of Philadelphia, Inc."

Each group sincerely believes it is vindicating the rights of the public, yet each advances separate and conflicting views on how this should be done. Caught in the conflict, as it increasingly finds itself these days, is the federal judiciary, which more often than not, experiences agonizing difficulty in perceiving the proper distinction between the due exercise of discretion by an agency of a co-equal branch of government and the necessity for concluding that the agency decision violates the spirit, if not the letter, of the Congressional mandate creating that agency. And this phenomenon is occurring with increasing frequency because private representatives of the community, as here, volunteering in the public interest, having been unsuccessful in obtaining a requested specific form of agency action, turn to the federal courts to attain their objective, notwithstanding the extremely constricted limits of judicial review of administrative action.