521 F.2d 142
 10 Empl. Prac. Dec. P 10,350
 Robert Paul OBURN et al., Plaintiffs-Appellants,
v.
Milton SHAPP et al., Defendants-Appellees,
William Bolden, III, and all minority applicants to and
employees of Pennsylvania State Police,
Intervening Defendants-Appellees.
Donald LUTZ and Michael Warfel, Plaintiffs-Appellants,
v.
Milton SHAPP et al., Defendants-Appellees,
William Bolden, III, and all minority applicants to and
employees of Pennsylvania State Police,
Intervening Defendants-Appellees.
 Nos. 75-1189, 75-1190.
 United States Court of Appeals,
Third Circuit.
 Argued May 2, 1975.
Decided Aug. 4, 1975.
 
 Allan E. Ertel, William S. Kieser, Ertel and Kieser, Williamsport, Pa., Gordon W. Gerber, Gregory D. Keeney, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiffs-appellants.
 Norman J. Watkins, Deputy Atty. Gen., Lawrence Clark, Asst. Atty. Gen., J. Andrew Smyser, Deputy Atty. Gen., Robert P. Kane, Atty. Gen., Dept. of Justice, Harrisburg, Pa., for defendants-appellees.
 Harold I. Goodman, Cassandra M. Menoken, Mark B. Segal, Community Legal Services, Inc., Philadelphia, Pa., Robert J. Reinstein, Philadelphia, Pa., for intervening defendants-appellees.
 Before FORMAN, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Despite the insistence of the parties that we reach the merits of "reverse discrimination", a most troublesome subject, we resist the invitation and instead address ourselves to the narrow issue that is before us: did the district court abuse its discretion in denying a preliminary injunction sought by the plaintiffs. The plaintiffs, white applicants, for the position of state trooper in Pennsylvania, assert that the defendants are discriminating against them by hiring members of minority groups[1] through the use of racial quotas which exclude plaintiffs. Their application for preliminary injunction was denied by the district court. We hold that the district court did not abuse its discretion and therefore, we affirm the district court's denial of the preliminary injunction.
 
 I. BACKGROUND
 
 2
 Admission to the Pennsylvania State Police is achieved by competitive selection procedures. Enlisted members of the State Police Force (state troopers) are appointed by the Commissioner of the Pennsylvania State Police, See 71 P.S. § 65 (1975 Supp.), after having first satisfied certain criteria and qualification standards established by statute, See 71 P.S. § 1193 (1962), and by the rules and regulations promulgated by the Commissioner, See 71 P.S. § 251 (1975 Supp.). The eligibility criteria currently in effect, and which were in effect when the individual plaintiffs in these appeals made employment application to the State Police, were established as interim standards[2] under a Consent Decree. The Consent Decree was entered in Bolden, et al. v. Pennsylvania State Police, et al., C.A. No. 73-2604 (E.D.Pa. June 21, 1974), an action alleging discrimination brought by a black against the Pennsylvania State Police.
 
 
 3
 The Bolden litigation sought to remedy the prior discriminatory (against minorities) employment and promotion policies of the Pennsylvania State Police. The Consent Decree, entered as a final judgment in Bolden,[3] establishes a temporary hiring goal for the State Police and revises the hiring procedures of the State Police pending the development of employment tests validated as being job related. Cf. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The hiring goal provides that from all qualified applicants eligible as state troopers, at least one-third of those selected for the State Police Academy shall be minorities. This hiring ratio of one-minority applicant for every two non-minority applicants is to be followed until 9.2% Of "the enlisted complement of the Pennsylvania State Police consists of minorities."[4]
 
 
 4
 As validated employment criteria have yet to be developed, the interim standards and procedures established in Bolden govern the selection of qualified applicants. An applicant must meet preliminary requirements[5] and have an initial interview before taking a written examination. See Bolden Consent Decree, P I.3. (a), (b); App. at 42-44. The interim written examination is administered and graded by the Pennsylvania Civil Service Commission ("Commission"). The Commission determines the passing score of the written examination. See Bolden Consent Decree, P I.3. (c); App. 44.
 
 
 5
 From among those who attain a passing score on the written examination, the State Police select applicants for "further processing." The selection of applicants proceeds in the order of the applicants' written test scores subject to the requirement that
 
 
 6
 ". . . the State Police shall select for further processing as many applicants who passed the examination as are necessary to fill the projected cadet class And meet the minority hiring ratio. . . ."
 
 
 7
 Bolden Consent Decree, P I.3. (d)(1) (emphasis supplied); App. at 44.
 
 
 8
 Those applicants selected for further processing must pass a physical examination; an oral interview; and undergo a background investigation. Bolden Consent Decree, P I.3. (d)(3), (4) and (5); App. at 45-47. Applicants successfully meeting these requirements are then assigned a "final earned rating" derived from a weighted average of the written examination and oral interview. Eligible applicants are ranked in sequential order of their final earned ratings and are selected for admission into the Academy in the order of their rank, subject to the minimum one-third ratio for the hiring of minorities.[6]
 
 II. FACTUAL & PROCEDURAL SETTING
 
 9
 The instant appeals, both class actions brought pursuant to 28 U.S.C. §§ 1331, 1343(3),[7] arise out of two separate actions challenging the selection of a cadet class by the interim standards established in the Bolden Consent Decree. Plaintiffs' challenge to the composition of the cadet class convening March 6, 1975, focuses on the September 4, 1974 written examination given to applicants for the Pennsylvania State Police. As mandated by the Bolden Consent Decree, the Commission administered and graded the written examination. The Commission established as the minimum passing score 60 correct answers out of 120 questions on the written examination.[8] In Oburn v. Shapp, 393 F.Supp. 561 (E.D.Pa.1975) (hereinafter the Oburn case), the individual plaintiffs were white[9] applicants who scored 60 or more on the written examination.[10] In their complaint they assert that they were eliminated from "further processing" even though minority applicants with lower scores on the written examination were selected for "further processing." The Oburn plaintiffs allege that in order for the defendants to comply with the interim hiring goal of one-third minority candidates, all non-minority applicants who scored below 92 on the written examination had to be eliminated from "further processing," while minority applicants who scored 65 or better on the written examination were "processed further." Thus, the Oburn plaintiffs allege that they were unconstitutionally denied equal protection of the laws because they were eliminated from "further processing" in favor of minority applicants solely on the basis of plaintiffs' race and national origin.
 
 
 10
 Although the plaintiffs in the companion case of Lutz v. Shapp, 393 F.Supp. 561 (E.D.Pa.1975) (hereinafter the Lutz case) assert a legally identical theory of "reverse discrimination," they do so under factually different circumstances. The individual plaintiffs in Lutz were white applicants who scored 92 or better on the written examination and accordingly were afforded an oral interview, a physical examination and a background investigation. Based upon their scores, the individual plaintiffs in Lutz were assigned a final earned rating and were ranked in order of their rating along with the other applicants who were "processed further."[11] In this action, the Lutz plaintiffs assert that they were denied admission into the cadet class although they achieved a higher final earned rating than most minority applicants who were accepted. The Lutz plaintiffs assert that but for the one-third minority hiring goal, they would have been admitted to the cadet class.[12]III. PRELIMINARY INJUNCTION
 
 
 11
 In both cases before us, plaintiffs have appealed only from the denial of their separate motions for a preliminary injunction. We emphasize the nature of these appeals as it necessarily affects the scope of our review and the burden that must be met by the appellant. See Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316-17, 60 S.Ct. 517, 84 L.Ed. 774 (1940); See generally 9 J. Moore, Federal Practice P 110.25(1) (2d ed. 1973). The burden on the appellant to secure a reversal is high, Scooper Dooper, Inc. v. Kraftco Corp., 460 F.2d 1204 (3d Cir. 1972), and our scope of review is limited to:
 
 
 12
 ". . . determining whether there has been an abuse of discretion, an error of law or a clear mistake in the consideration of the proof. National Land & Investment Co. v. Specter, 428 F.2d 91, 95 (3d Cir. 1970)."
 
 
 13
 Commonwealth of Pennsylvania ex rel. Creamer v. United States Dept. of Agriculture, 469 F.2d 1387, 1388 (3d Cir. 1972).[13] Accord Delaware River Port Auth. v. Transamerican Trailer Transp., 501 F.2d 917 (3d Cir. 1974); Croskey Street Concerned Citizens v. Romney, 459 F.2d 109, 112 (3d Cir. 1972) (Aldisert, J., concurring). The instant appeals involve neither an error of law nor a clear mistake in the consideration of the proof.[14] Rather, we are presented with the sole question of whether the district court's denial of the injunction clearly constituted abuse of permissible discretion. See United States v. Corrick, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936); Meccano, Ltd. v. John Wanamaker, 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822 (1920); 7 J. Moore, Federal Practice, P 65.04(2) (2d ed. 1974).
 
 
 14
 In measuring the district court's consideration of appellants' motions for preliminary injunctive relief, we recognize that the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured Pendente lite if relief is not granted. Delaware River Port Auth. v. Transamerican Trailer Transp. Inc., supra at 919-20; See A. L. K. Corp. v. Columbia Pictures, Inc., 440 F.2d 761, 763 (3d Cir. 1971). Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." Delaware River Port Auth. v. Transamerican Trailer Transp., Inc., supra at 920.
 
 
 15
 In the context of this dispute, the district court properly considered all four factors, and as its opinion reveals, engaged in the required balancing of interests. See Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). We therefore turn to an examination of the four factors explored by the district court to determine if the district court abused its discretion in denying the plaintiffs a preliminary injunction.
 
 
 16
 1. "Reasonable Probability of Eventual Success"
 
 
 17
 It is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a Prima facie case showing a reasonable probability that it will prevail on the merits. See Croskey Street Concerned Citizens v. Romney, supra at 111; Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969).
 
 
 18
 Plaintiffs claim that they have made the requisite showing of a likelihood of success upon the merits after a full hearing. They argue that the standards of selection in hiring utilized by the defendants as mandated by the Bolden Consent Decree provides for the imposition of racial classifications by an arm of the state. Any such racial classifications by a state, they claim, is presumptively invalid under the Equal Protection Clause of the Fourteenth Amendment and may be permitted only where there is shown an overriding statutory purpose and a compelling state interest. See Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Plaintiffs urge that this stringent standard is not met under the circumstances of this case as racial classifications in the guise of racial quotas are either Per se unconstitutional or are not justified here by a "compelling state interest." Appellants' Brief at 18. Moreover, plaintiffs urge that the district court erred in holding that plaintiffs had not shown a likelihood of success in that the district court considered the Bolden proceedings in which plaintiffs were not parties. Appellants' Brief at 25-31; See Hansberry v. Lee, 311 U.S. 32, 41, 61 S.Ct. 115, 85 L.Ed. 22 (1940).
 
 
 19
 Defendants, on the other hand, urge that the district court properly determined that plaintiffs failed to demonstrate a probability that plaintiffs would prevail on the merits. First, defendants assert that plaintiffs' suit is an improper collateral attack on the Bolden Consent Decree. See, e.g., Black and White Children of the Pontiac School System v. School District of Pontiac, 464 F.2d 1030 (6th Cir. 1973); Miller v. Meinhard-Commercial Corp., 462 F.2d 358, 360 (5th Cir. 1972); Burns v. Board of School Commissioners, 437 F.2d 1143 (7th Cir. 1971). Second, defendants assert that the Bolden Consent Decree was fashioned to remedy employment discrimination against minorities and that to grant plaintiffs' motion would reinstate the very discrimination which the district court in Bolden sought to eradicate.[15] Third, defendants argue that the use of racial quotas to correct past discriminatory procedures is not constitutionally objectionable under present circumstances.
 
 
 20
 We turn first to plaintiffs argument that their due process rights were violated when the district court took judicial notice of the Bolden litigation. The consequence of this action, plaintiffs claim, was to bind them to the Bolden judgment even though the plaintiffs were not parties to that earlier litigation.[16] See Blonder-Tongue Lab., Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Hansberry v. Lee, supra; Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840 (3d Cir. 1974). At this stage of the proceedings, however, and upon this abbreviated record, we cannot dispose of the arguments addressed to the Bolden litigation. The record before us is incomplete and has yet to be closed with respect to proofs which bear upon this issue.[17] Moreover, we find it unnecessary to consider this issue at this time. From our examination of the record before us, we conclude that apart from Bolden there is a sufficient evidentiary basis to sustain the district court's holding that the plaintiffs do not have a likelihood of success.[18]
 
 
 21
 Plaintiffs next argue that racial quotas in hiring subjects white applicants such as plaintiffs to unconstitutional treatment. This argument rests on two alternative premises, both of which fail to establish plaintiffs' likelihood of success on the merits. Plaintiffs contend first that a racial classification by a state is unconstitutional Per se. Appellants' Brief at 18. Alternatively, they claim that if the racial classifications here are not unconstitutional Per se, they are nevertheless unconstitutional in that a "compelling state interest" is absent. Appellants' Brief at 22.
 
 
 22
 The short answer to plaintiffs' first assertion is that while classifications based on race are suspect and require the most stringent judicial scrutiny, where utilized to formulate a remedy against discrimination they have yet to be held unconstitutional Per se. See Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971); NAACP v. Allen, 493 F.2d 614, 618-19 (5th Cir. 1974); United States v. Wood, Wire & Lathers, Intl. Union, 471 F.2d 408 (2d Cir.), Cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); Porcelli v. Titus, 431 F.2d 1254, 1257-58 (3d Cir.), Cert. denied, 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112 (1970); CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931-32 (2d Cir. 1968). Indeed, courts of appeals other than our own have held it to be reversible error for a district court to withhold quota relief where other forms of remedy failed to eliminate racially discriminatory practices or effects. See Morrow v. Crisler, 491 F.2d 1053 (5th Cir.) (en banc), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); Reed v. Arlington Hotel Co., 476 F.2d 721 (8th Cir.), Cert. denied, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); Cf. Patterson v. Newspaper and Mail Deliverers' Union, 514 F.2d 767 (2d Cir. 1975) (Title VII action); Erie Human Relations Commission v. Tullio, 493 F.2d 371, 374 (3d Cir. 1974).
 
 
 23
 Plaintiffs' alternate theory is that they enjoy a likelihood of success in establishing that defendants have no "compelling state interest" sufficient to justify the utilization of racial classifications.[19] They argue that in the circumstances of this case any interest of defendants in utilizing racial quotas cannot be deemed compelling. Defendants, however, claim that they have properly used racial quotas to end the perpetuation of prior employment practices discriminatory in respect to racial minorities. Defendants contend that their interest in offsetting prior racially discriminatory practices and the effects of such practices, constitutes a remedial purpose sufficient to warrant the use of racial quotas.[20]
 
 
 24
 After considering the opposing contentions of the parties, we find that the record to date favors the position taken by defendants. Determination of a "compelling state interest" depends upon the circumstances of each case. Here, plaintiffs already have conceded, as they must, that the practices of the Pennsylvania State Police in past years discriminated against racial minorities.[21] Moreover, there is evidence in the record that the defendants adopted racial hiring quotas and new testing procedures under the Bolden Consent Decree, which was structured to correct racially discriminatory practices.[22] Consequently, given these portions of the record before us, we cannot say that the district court acted improvidently in concluding that plaintiffs failed to make the requisite showing that they have a substantial likelihood of success on the merits.[23]
 
 2. Irreparable Injury
 
 25
 A party moving for preliminary injunctive relief must carry the burden of showing irreparable injury. See Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); Yakus v. United States, 321 U.S. at 439-40, 64 S.Ct. 660; Sims v. Greene, 161 F.2d 87, 89 (3d Cir. 1947). "A finding of no irreparable harm is itself sufficient to uphold the district court's denial of a preliminary injunction as a proper exercise of discretion." Commonwealth of Pennsylvania ex rel. Creamer v. United States Dept. of Agriculture, 469 F.2d 1387, 1388 (3d Cir. 1972). While what may constitute irreparable harm in a particular case is, of course, dependent upon the particular circumstances of the case, we cannot say that the district court's finding here that plaintiffs would not suffer irreparable harm was clearly erroneous. See Sims v. Greene, supra.
 
 
 26
 Plaintiffs assert numerous grounds to support their allegations of irreparable injury. Appellants' Brief at 36-37. Their allegation that they have been irreparably harmed by the denial of Fourteenth Amendment rights is not compelling. Earlier in this opinion we indicated serious doubt with the validity of the legal premises underlying that claim of constitutional deprivation. See III.1. Supra; Delaware & Hudson Ry. Co. v. United Transp. Union, 146 U.S.App.D.C. 142, 450 F.2d 603, Cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).
 
 
 27
 The plaintiffs also claim that if the March 6, 1975 cadet class is not enjoined they will suffer a loss of those benefits derived from state employment.[24] However, we do not regard losses such as these as constituting irreparable injury. Such losses may be remedied by appropriate judicial decrees if the plaintiffs should prove successful. See Sampson v. Murray, supra. Such judicial relief may properly include provisions for employment, back-pay, fringe benefits and the like. In holding, as we do, that the district court's finding is not clearly erroneous we have been guided by the consideration that:
 
 
 28
 "The key word in this consideration is Irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."
 
 
 29
 Virginia Petroleum Jobbers Ass'n v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958) (emphasis in original), Quoted with approval in Sampson v. Murray, 415 U.S. at 90, 94 S.Ct. at 953.
 
 
 30
 3. The Public Interest and 4. Other Interested Parties
 
 
 31
 Absent a showing of irreparable injury the district court was obliged to deny the plaintiffs' motion for a preliminary injunction. Commonwealth of Pennsylvania ex rel. Creamer v. United States Dept. of Agriculture, 469 F.2d at 1388; National Land & Investment Co. v. Specter, 428 F.2d 91, 97 (3d Cir. 1970). Having concluded that the district court had not abused its discretion, we would normally say no more. It seems appropriate, however, because of the public nature of this controversy, to complete our discussion by briefly referring to the remaining factors generally considered on an application for preliminary injunction.
 
 
 32
 A balancing of the rights of both parties involved here and a weighing of the potential detriment to the public interest and other interested parties, clearly favors the action taken by the district court. It is uncontrovertedthat the Pennsylvania State Police were in need of additional state troopers at the time the March 6, 1975 cadet class was convened.[25] Although witnesses testified that the state police were operating efficiently even though understaffed,[26] such evidence cannot, standing alone, establish that the public interest would not be adversely affected by enjoining the cadet training. In considering where the public interest lies, it is essential to evaluate the Possible effects upon the public from the grant or denial of injunctive relief. Here, the district court determined that an inadequately staffed state police force would raise the possibility of substantial harm to the public interest. We agree.
 
 
 33
 Moreover, this record, to the extent that it has been developed, provides no support for the plaintiffs' assertion that the public interest in an adequately staffed state police force will be frustrated unless the best individuals are selected as cadets. Perhaps as a general proposition, there is merit to this suggestion. However, on this record, there is no basis for holding that the district court was clearly erroneous in its finding that the minority members of the cadet class who had a final earned rating lower than plaintiffs' were not less competent than plaintiffs. See 393 F.Supp. at 574-75. All the minority candidates had attained a passing score on the written examination and, absent a job-validation of the examination procedures, there is no warrant to conclude that a higher-scoring applicant would be more qualified to be a state trooper than a lower-scoring applicant. Thus, even accepting plaintiffs' theory that the public interest would be thwarted unless the most competent candidates were admitted to the Academy, this record fails to demonstrate that the most competent were not admitted.
 
 
 34
 Finally, we agree with the district court that consideration of the interests of third parties also weighs against the granting of a preliminary injunction. There can be no dispute that the minority and non-minority applicants admitted to the March 6, 1975 cadet class would be adversely affected by the grant of an injunction which interrupts and may preclude their continued training and employment as state troopers. Even if we were to assume contrary to our holding, See supra p. 150, that plaintiffs suffer irreparable harm by their exclusion from the March 6, 1975 cadet class, it is nevertheless apparent that to the extent that plaintiffs would Avoid injury to themselves by the grant of a preliminary injunction, those currently enrolled in the March 6, 1975 cadet class would Suffer injury by the grant of the injunction.
 
 
 35
 "We believe that when considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other . . .."
 
 
 36
 Delaware River Port Auth. v. Transamerican Trailer Transp., Inc., 501 F.2d at 924.
 
 IV. CONCLUSION
 
 37
 Our review of the district court's consideration of the applicable standards for issuing a preliminary judgment reveals that the district court in its denial of the injunctive relief sought did not abuse its permissible discretion, did not err as a matter of law, and did not make a clear mistake in the consideration of the proof. We wish to make clear, however, that our affirmance of the district court's action does not preclude the plaintiffs from fully developing their case at a final hearing. This Court's prior statement in National Land is appropriate in these proceedings:
 
 
 38
 "(A)ppellants were afforded a full and fair opportunity, in the context of a hearing on their motion for a preliminary injunction, to establish their right to preliminary equitable relief. But we hasten to add that 'there has been no final hearing' and that 'the facts, after final hearing, * * * may appear of different substance and texture and possess very different legal effects.' United States v. Ingersoll-Rand Co., 320 F.2d 509, 523 (3d Cir. 1963). Our decision on the limited question of the denial of the preliminary injunction is not intended to intimate any opinion about the ultimate merits of appellants' case."
 
 
 39
 National Land & Investment Co. v. Specter, supra at 100.
 
 
 40
 We will affirm the order of the district court.
 
 
 
 [1]
 Minorities are defined as non-white and Spanish surnamed individuals. See Complaint, Sec. III, P 3, Oburn, et al. v. Shapp, et al., 393 F.Supp. 561 (E.D.Pa.1975); Complaint, Sec. V, P 3, Lutz, et al. v. Shapp, et al., 393 F.Supp. 561 (E.D.Pa.1975)
 
 
 [2]
 It is conceded that validated and job related tests are in the process of preparation and that the tests on which plaintiffs secured the marks on which they rely have not been validated. See Oburn, et al. v. Shapp, et al., 393 F.Supp. at 569-570
 
 
 [3]
 See Complaint, Consent Decree Attachment at 1, Oburn v. Shapp, 393 F.Supp. 561 (E.D.Pa.1975) (hereinafter "Bolden Consent Decree"); App. at 40
 
 
 [4]
 Bolden Consent Decree, P I.1; App. 41. The goal of a 9.2 percentage of minorities on the State Police force was arrived at by equating that percentage to the "percent of minorities in the Pennsylvania labor force from which State Policeman and women are selected." Id., P I.; App. 41. The one-third hiring ratio is to be applied in the selection of candidates to the Academy from the list of qualified applicants, regardless of whether the eligibility list of qualified applicants is established pursuant to the interim standards and procedures set forth in the Bolden Consent Decree or is established pursuant to employment standards validated as job-related by an independent expert and approved by the district court
 
 
 [5]
 The preliminary requirements are:
 "Each applicant for membership must possess a high school diploma or a G.E.D. equivalency degree. Each applicant must be between twenty-one and thirty years of age at the time of the convening of the cadet class for which he or she is selected. Each applicant must have 20/40 vision in each eye uncorrected. Each applicant must be a resident of Pennsylvania for one year immediately prior to filing such preliminary application, unless said residency requirement is modified by law."
 Bolden Consent Decree, P I.3. (a)(1); App. 42.
 
 
 [6]
 The Bolden Consent Decree provides that the selection of applicants into the State Police Academy's cadet class is to proceed in order of each applicant's listing by final earned ratings:
 "Provided selection in this manner results in a class which shall be comprised of at least one-third (1/3) minority members until the above described nine point two percent (9.2%) quota is reached. If selection of a class in this manner does not produce the aforesaid result and if there are additional minorities in the pool of qualified applicants, said qualified minorities shall be selected for the class until either the aforesaid ratio is reached for the class or the pool of qualified minorities is exhausted."
 Bolden Consent Decree, P I.3. (e) (emphasis supplied); App. 47-48.
 
 
 [7]
 The two complaints filed by plaintiffs reveal that their claims are asserted under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. No separate claim is asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e Et seq. Even if the complaint were, in part, based upon alleged Title VII violations, our disposition of these appeals would not change. Cf. Patterson v. Newspaper and Mail Deliverers' Union, 514 F.2d 767, 772-73 (2d Cir. 1975)
 
 
 [8]
 Transcript of March 4, 1975 Hearing on Preliminary Injunction at 78, Oburn v. Shapp, 393 F.Supp. 561 (E.D.Pa.1975) (testimony of Edgar L. Yost, Chief of Evaluation of the Pennsylvania State Civil Service Commission)
 
 
 [9]
 We have used the term "white" throughout this Opinion to describe all non-minority individuals
 
 
 [10]
 In the Oburn case, the individual plaintiffs applying to the Academy received the following scores on the written examination: Robert Paul Oburn, 91; Phillip D. Fazenbaker, 84; Hall E. Solomon, Jr., 87. The other individual plaintiffs in the Oburn case were enlisted state troopers who challenged the interim promotion procedures and goals as they were defined by the Bolden Consent Decree
 At the hearing on the motion for preliminary injunction plaintiffs' counsel orally narrowed the scope of the written motion to enjoin only the convening of the cadet class. Transcript of March 4, 1975 Hearing on Preliminary Injunction, Supra note 7, at 9. Consequently, as the promotion procedures and the issues surrounding them have yet to be litigated in the district court, they are not before us on these appeals. The issues for our consideration are thus directed only to the selection procedures for hiring additional state troopers.
 
 
 [11]
 The final earned ratings of the plaintiffs in the Lutz case were: Donald Lutz, 139; Michael Warfel, 122
 
 
 [12]
 The State Police cadet class which was to convene on March 6, 1975 was to consist of 153 cadets. Under the one-third minority hiring goal imposed by the Bolden consent decree at least 51 cadets were to be minority applicants. Based upon the order of applicants listed according to their final earned ratings, only 11 minority applicants were among the first 153 individuals. One of these minority applicants declined admission to the Academy, resulting in 41 minority applicants being "preferred" over the plaintiffs. Transcript of March 4, 1975 Hearing on Preliminary Injunction, Supra note 7, at 132. Thus, the Lutz plaintiffs assert that they were "bumped" from the list of those to be admitted into the cadet class in favor of these 41 additional minority applicants
 The interests of minority applicants to and employees of the State Police is sought to be represented in this case by William Bolden, III, plaintiff in the Bolden litigation referred to herein. Bolden's motion to intervene in these proceedings was granted by the district court after the denial of the preliminary injunction. Record, Document No. 10, Oburn, et al. v. Shapp, et al., 393 F.Supp. 561 (E.D.Pa.1975); Record, Document No. 6, Lutz, et al. v. Shapp, et al., 393 F.Supp. 561 (E.D.Pa.1975).
 
 
 [13]
 In explanation of our limited appellate function, this Court previously has stated:
 "This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief."
 United States Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970).
 
 
 [14]
 On these appeals, we have not found it necessary to reach the issue of the district court's treatment of the Bolden Consent Decree or evidence. See our discussion at pp. 148-149 Infra. We have considered only the evidence as introduced in this case by the parties
 
 
 [15]
 In this proceeding, plaintiffs concede that racially discriminatory practices had been employed by the Pennsylvania State Police for years past. Transcript of March 4, 1975 Hearing on Preliminary Injunction, Supra note 7, at 12
 
 
 [16]
 Defendants claim that the Fraternal Order of Police, a plaintiff in this proceeding, was a party in the earlier Bolden litigation and that all plaintiffs here had notice of the Bolden litigation and had an opportunity to intervene. See Intervening Defendant-Appellees Brief at 54
 
 
 [17]
 Defendants make a reciprocal argument that the instant actions brought by plaintiffs constitute impermissible collateral attacks on the Bolden Consent Decree. See, e. g., Black and White Children of the Pontiac School System v. School District of Pontiac, supra. Just as it is premature and inappropriate on this record at this time to consider the plaintiffs' Bolden argument, so is it premature and inappropriate for us to consider this reciprocal argument of the defendants
 
 
 [18]
 While the ruling on the motion for preliminary injunction leaves open the final determination of the merits of the case, in an appeal from the grant or denial of a preliminary injunction we may consider the merits to the extent that they have been indicated by affidavit or testimony. See Ross-Whitney Corp. v. Smith Kline & French Lab., 207 F.2d 190 (9th Cir. 1953). However, pending a decision on the merits, the findings of fact and conclusions of law are all preliminary and do not foreclose any findings or conclusions to the contrary based upon the record as developed after final hearing. See United States v. Ingersoll-Rand Co., 320 F.2d 509, 523 (3d Cir. 1963)
 
 
 [19]
 We caution that the "compelling state interest" standard does not affect our standard of review. Application of this standard of strict judicial scrutiny is for the district court in the first instance. Our standard of review remains unchanged: i. e., whether in the application of this standard, the district court abused its discretion, incorrectly applied proper legal principles or made a clear mistake in the consideration of the proof. See, e. g., NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974)
 
 
 [20]
 We recognize that the Supreme Court has yet to issue a definitive ruling on the constitutionality of racial quotas to remedy racial discrimination. DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). See discussion in DeFunis Symposium, 75 Colum.L.Rev. 483 (1975). However, in support of their position, the defendants refer us to many judicial authorities which in constitutional or Title VII contexts have permitted racial quotas to remedy racial discrimination. See, e. g., Patterson v. Newspaper and Mail Deliverers' Union, 514 F.2d 767 (2d Cir. 1975); Boston Chapter NAACP, Inc. v. Beecher, 504 F.2d 1017 (1st Cir. 1974), Cert. denied, --- U.S. ---, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); Rios v. Enterprise Ass'n Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974); NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974); Erie Human Relations Comm'n v. Tullio, 493 F.2d 371 (3d Cir. 1974); Vulcan Society v. Civil Svc. Comm'n, 490 F.2d 387 (2d Cir. 1973); Bridgeport Guardians, Inc. v. Bridgeport Civil Serv. Comm'n, 482 F.2d 1333 (2d Cir. 1973); Commonwealth of Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (en banc); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) (en banc), Cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Contractors Ass'n v. Secretary of Labor, 442 F.2d 159 (3d Cir.), Cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Porcelli v. Titus, 431 F.2d 1254 (3d Cir.), Cert. denied, 402 U.S. 944, 91 S.Ct. 1612, 29 L.Ed.2d 112 (1970). But see Harper v. Kloster, 486 F.2d 1134 (4th Cir. 1973); Lige v. Town of Montclair, 134 N.J.Super. 277, 340 A.2d 660 (App.Div. 1975)
 Nonetheless, even in view of these authorities, we share and are aware of the recurring reservations and concerns expressed in the various opinions cautioning against indiscriminate use of racial quotas as remedial devices. Representative of these concerns are:
 "Despite my doubts that its constitutional validity can be reasonably articulated, this overwhelming precedent constrains me to concur in holding that the imposition of quota hiring relief is a permissible exercise of the federal chancellor's discretion."
 Morrow v. Crisler, 491 F.2d 1053, 1059-60 (5th Cir.) (en banc) (Clark, J., concurring), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); and
 "A racial quota is inherently obnoxious, no matter what the beneficent purpose. Such a quota is demeaning and divisive. At best it is a lesser evil. It is not to be encouraged."
 Patterson v. Newspaper and Mail Deliverers' Union, 514 F.2d 767, 776 (2d Cir. 1975) (Feinberg, J., concurring).
 
 
 [21]
 See supra note 15
 
 
 [22]
 Transcript of March 4, 1975 Hearing on Preliminary Injunction, Supra note 7, at 76-78, 81
 
 
 [23]
 Our discussion here, which is expressly limited to determining the propriety of a denial of a preliminary injunction, is not to be regarded as indicating any view with respect to the ultimate merits of the factual and legal issues presented after a full record has been developed. See supra note 18
 
 
 [24]
 The plaintiffs' motion for a preliminary injunction, among other things, sought to enjoin the defendants from "appointing, seating or training any applications to the State Police Academy . . . ." Despite the admission of candidates to the March 6, 1975 cadet class, the issue before us is not moot. Although the cadet class has convened, it has not graduated and the cadets are still in training. Consequently the effective relief sought by plaintiffs may still be granted if so warranted. The controversy before us thus remains "live" and the relief requested cannot be deemed moot. Cf. Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974)
 
 
 [25]
 Transcript of March 4, 1975 Hearing on Preliminary Injunction, Supra note 7, at 57-58
 
 
 [26]
 Id. at 159-60 (testimony of Salvador L. Rodriguez); Id. at 198-99 (testimony of Clifford P. Artmen)