Eva CIECHON, individually and on behalf
of a class of employees of the Chicago
Fire Department, Plaintiff–Appellee,

v.

CITY OF CHICAGO et al.,
Defendants–Appellants.

No. 79–2329.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1980.

Decided Nov. 20, 1980.

Richard F. Friedman, Corp. Counsel, Chicago, Ill., for defendants–appellants.

Robert S. Sugarman, Chicago, Ill., for plaintiff–appellee.

Before SWYGERT and SPRECHER, Circuit Judges, and DUMBAULD, Senior District Judge.[*]

---

[*] The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

SWYGERT, Circuit Judge.

This is an appeal from the granting of a preliminary injunction on behalf of three intervening plaintiffs, lieutenants of the Chicago Fire Department, enjoining the City and its agents from suspending intervenors and "persons similarly situated in their employment as career–service employees of the Chicago Fire Department" prior to a full hearing before the City of Chicago Personnel Board.

The issues presented are: (1) did the district court properly conclude that all prerequisites for a preliminary injunction were established by intervenors, and (2) does the Due Process Clause of the Fourteenth Amendment require a full hearing prior to suspension of public employees for violation of a city ordinance that requires city employees to reside in the city. We reverse the district court's order granting a preliminary injunction.

I

Section 25–30 of the Municipal Code of the City of Chicago provides that "officers and employees in the . . . service of the city shall be actual residents of the city" and any officer or employee "who shall fail to comply with the provisions of this section shall be discharged from the service of the city in the manner provided by law." [1]

In the spring of 1978, Fire Commissioner Richard Albrecht established the Internal Affairs Division (IAD) to investigate complaints that Fire Department employees were not city residents. Department policy from May 1978 to September 1, 1978 regarding residency was that when a complaint was received that an employee was not a resident, the employee was advised of the complaint and encouraged to comply in the future.[2] On August 15, 1979, Commissioner Albrecht notified all Department members that "[e]ffective September 1, 1979, any member found in violation of the residency requirement . . . will be suspended by the Commissioner for thirty (30) days and charges will be filed with the Personnel Board . . . seeking said member's discharge."

In mid–September 1979, each intervenor was called into the office of Captain James Ryan, Director of the Internal Affairs Division.[3] None of them received prior notice of the purpose of the meeting.[4] Ryan informed each intervenor that complaints had been received regarding his residency, that the IAD had conducted an investigation, and that the Commissioner would review the evidence and decide whether to suspend and file charges against him.[5] Ryan stated at these meetings that if they were suspended and charges were filed against them, they would be entitled to a full hear-

---

**1.** Chicago Fire Department regulations also define as an offense under section 61.030 an employee's "failure to reside within the corporate boundaries of the City of Chicago." The City of Chicago Personnel Rules provide that "[f]ailure to be an actual resident of the City of Chicago" is "a sufficient cause for disciplinary action against an offending employee," Rule XVI, section 1(u) (Dec. 1978), including suspension or discharge, *id.* section 2(b), (d).

**2.** No date by which the employee had to comply was given.

**3.** Lieutenant Bendy met with Ryan on September 13, 1979, Lieutenant O'Boyle on September 18, and Lieutenant Andres on September 19.

**4.** O'Boyle learned from someone else in the Department that the subject of the meeting was probably residency.

**5.** According to Ryan, the procedure that was followed with each intervenor was: the IAD conducted an investigation of residency after complaints were received; the Director (Ryan) called each individual in for an informal meeting to inform him of the results of the investigation; the Director made a recommendation regarding disciplinary action to the Commissioner; the Commissioner, if he thought action was warranted, asked the City's law department to review the evidence; if the Corporation Counsel concurred, suspension was imposed and charges filed for the employee's discharge.

ing where they could have an attorney and present evidence.

On October 24, 1979, each intervenor was notified in writing that he was suspended for thirty days effective November 1, 1979, and that a hearing before the Personnel Board had been set for a date before November 30, 1979.[6] The intervenors were also served with notice containing a statement of the specific charges.

Intervenors, representing a class of similarly situated Fire Department employees, asked the district court to enjoin the City and its agents from imposing suspensions prior to a full hearing. The district court found, *inter alia*, that intervenors had a property interest in their employment; they had shown a probability of success on the merits in proving a due process violation; the suspensions were "indefinite in length";[7] due process required a full hearing prior to suspension; and defendants would not be injured if the suspensions were enjoined.

## II

We note at the outset that appellate review of a preliminary injunction is limited in scope. *Sangmeister v. Woodard*, 565 F.2d 460, 464–65 (7th Cir.1977), *cert. denied*, 435 U.S. 939, 98 S.Ct. 1516, 55 L.Ed.2d 535 (1978). An appellate court will set aside an order granting an injunction "only where it can be said that the discretion vested in the district court with respect to these matters has been improvidently exercised." *Scherr v. Volpe*, 466 F.2d 1027, 1030 (7th Cir.1972); accord, *Local Div. 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility*, 585 F.2d 1340, 1350 (7th Cir.1978).

In the case before us, the district court conducted an adversary hearing during which witnesses were examined, affidavits were submitted, and arguments were presented by both sides. Based on this record, the district court concluded that intervenors established all the elements required for a preliminary injunction, and thus granted the injunction.

■ A preliminary injunction will not issue unless the movant establishes: (1) a reasonable likelihood of success on the merits; (2) irreparable injury and absence of an adequate remedy at law; (3) that the threatened harm to the plaintiff outweighs the harm the injunction may cause the defendant; and (4) that the granting of the injunction will not disserve the public interest. *Local Div. 519, Amalgamated Transit Union v. LaCrosse Municipal Transit Utility, supra*, 585 F.2d at 1351; *Fox Valley Harvestore v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir.1976); *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1069 (7th Cir.1976).

■ "A preliminary injunction is an extraordinary remedy which is not available unless the plaintiffs carry their burden of persuasion as to *all* of the prerequisites." *Fox Valley Harvestore, supra*, 545 F.2d at 1097. Therefore, "[a]bsent a showing of irreparable injury the district court was obliged to deny the plaintiffs' motion for a preliminary injunction." *Oburn v. Shapp*, 521 F.2d 142, 151 (3d Cir.1975) (citing *Commonwealth of Pennsylvania ex rel. Creamer v. United States Dep't of Agriculture*, 469 F.2d 1387, 1388 (3d Cir.1972)). What constitutes irreparable injury in a case depends upon the particular facts of that case. *Oburn v. Shapp, supra*, 521 F.2d at 151. Here the district court found that loss of wages, employee benefits, and opportunities for promotion during the suspension period constituted irreparable injury. We disagree.

In *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), a probationary government employee was notified

---

**6.** Andres's hearing was scheduled for November 15, 1979, Bendy's for November 27, and O'Boyle's for November 30.

**7.** Although the suspensions were initially for thirty days, they may be extended by the Commissioner pending final determination of the charges. City of Chicago Personnel Rules, Rule XVI, section 4(b)(2).

that she was to be discharged for insubordination. She alleged that applicable Civil Service regulations relating to procedures for dismissal had not been followed, so she sought a temporary injunction against her dismissal pending her administrative appeal. The plaintiff argued that the loss of income pending the outcome of her appeal amounted to irreparable injury. The Supreme Court disagreed, stating that "it seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Id.* at 90, 94 S.Ct. at 952. The Court then quoted from *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir. 1958):

> "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

415 U.S. at 90, 94 S.Ct. at 952, 39 L.Ed.2d 166. *Accord, Oburn v. Shapp, supra,* 521 F.2d at 151.

In the instant case, intervenors faced a loss of income and employee benefits during the thirty–day suspension. This loss is not irreparable; if intervenors are vindicated at their hearings, they will receive backpay and be restored to their respective ranks.

### III

■ The parties stipulated that intervenors "are permanent career service employees of the City of Chicago who cannot be disciplined, suspended, or discharged without just cause and that therefore they have a property interest in their job which . . . cannot be taken without due process of law." The question, then, is what type of procedural protections are required in this case.[8]

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the recipient of Social Security disability payments challenged the state agency's termination of his benefits without a prior evidentiary hearing. In upholding the constitutionality of that procedure, the Supreme Court enunciated three factors to be considered in determining what due process requires in a particular case:

> first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest . . . .

*Id.* at 334–35, 96 S.Ct. at 902–903.

### A. Private Interest

In the instant case, as in *Mathews*, intervenors' "sole interest is in the uninterrupted receipt of this source of income pending final administrative decision," because if they ultimately prevail, they will receive backpay and be restored to rank. *See id.* at 340, 96 S.Ct. at 905. Although this private interest is not insubstantial, it does not compel the conclusion that a presuspension hearing is necessary to satisfy due process requirements.

In *Mathews*, the Court recognized that the termination of disability benefits may cause substantial hardship to the recipient. *Id.* at 342, 96 S.Ct. at 906. Nevertheless, the Court concluded that the private interest implicated in that case was not sufficient to warrant "depart[ure] from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 343, 96 S.Ct. at 907.[9]

---

**8.** "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

**9.** The Court noted that the recipient may have other sources of income available and that if he ultimately prevails, he will be entitled to retroactive benefits. *Mathews, supra,* 424 U.S. at 342–43, 96 S.Ct. at 906, 47 L.Ed.2d 218.

## B. Risk of Erroneous Deprivation

The second factor to be weighed in determining what procedural protections are required by due process is the risk of error in the presuspension procedures. In *Mathews*, the Court characterized the decision of medical eligibility as "sharply focused and easily documented," 424 U.S. at 343, 96 S.Ct. at 907, 47 L.Ed.2d 18, and noted that in many cases credibility of witnesses would not be a critical factor.

The determination of whether or not a firefighter lived in the city could be characterized in a similar manner; either a person resides within city limits or he does not. Much of the evidence involved is documentary: for example, tax records, utility bills, voting registration, and automobile registration. Such evidence, gathered in the IAD investigation, is examined by the Director of the IAD, the Fire Commissioner, and the Corporation Counsel before the decision to suspend is made. "*At the interim suspension stage,* [this procedure], although ... not beyond error, would appear sufficiently reliable to satisfy constitutional requirements." *Barry v. Barchi*, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (emphasis added).[10]

The risk of erroneous deprivation is also significantly reduced by the procedures provided in the postsuspension hearing. That hearing is a trial–like procedure, in which the firefighter may be represented by counsel, present witnesses and other evidence, and cross–examine the City's witnesses. If the suspension is found to have been erroneous, the employee is entitled to backpay and restoration of rank.

## C. Government's Interest

The City Council of Chicago has determined that it is in the public interest that officers and employees of the City reside within the City limits.[11] Similar residency requirements have been upheld as constitutional. *See, e. g., McCarthy v. Philadelphia Civil Service Commission*, 424 U.S. 645, 646–47, 96 S.Ct. 1154, 1155, 47 L.Ed.2d 366 (1976) (*per curiam*); *Pittsburgh Federation of Teachers Local 400 v. Aaron*, 417 F.Supp. 94, 96–97 (W.D.Pa.1976); *Conway v. City of Kenosha*, 409 F.Supp. 344 (E.D.Wis.1975). The City plainly has an important interest in disciplining employees who violate city ordinances or personnel regulations. *See Hoban v. Rochford*, 73 Ill.App.3d 671, 29 Ill.Dec. 531, 536–37, 392 N.E.2d 88, 93–94 (1979).

A balancing of the factors listed in *Mathews* leads us to conclude that a presuspension hearing is not required here. The City has an important interest in enforcing its ordinances; the initial decision to suspend is based on internal investigation results and documentary evidence which is reviewed at three levels before suspension is imposed, and the postsuspension procedure provides for a full evidentiary hearing; the effect on the private interest (intervenors' entitlement to their salaries and employee benefits) is minimized by the recovery of backpay and full restoration to rank that intervenors will receive if they ultimately prevail. We therefore disagree with the district court's finding that due process requires a presuspension hearing.[12]

---

In other cases, the Supreme Court has held that a predeprivation hearing is not required even though the plaintiff will not later be made whole if he prevails. *E. g., Mackey v. Montrym*, 443 U.S. 1, 11–12, 99 S.Ct. 2612, 2617–18 (1979); *Dixon v. Love*, 431 U.S. 105, 113, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977).

**10.** The fact that some suspended firefighters have been exonerated after a hearing or that some have had the charges against them later dropped does not compel a different conclusion. First, in *some* cases testimony of witnesses is important. "But procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the

generality of cases ...." *Mathews v. Eldridge, supra*, 424 U.S. at 344, 96 S.Ct. at 907, 47 L.Ed.2d 18. Second, if the firefighter moves into the City before the final decision, the Personnel Board is likely to drop the charges. "Bare statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process." *Id.* at 346, 96 S.Ct. at 908.

**11.** *See* text at note 1 *supra*.

**12.** Intervenors argue that a presuspension hearing is compelled by our holding in *Muscare v. Quinn*, 520 F.2d 1212 (7th Cir.1975) (*per curiam*), that due process required a hearing

Our conclusion is supported by the Supreme Court's holding in *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). In that case, a horse trainer's license was suspended without a prior hearing when a post–race test found drugs in his horse's system. The Court, after balancing the *Mathews* criteria, concluded that a presuspension hearing was not required by the Due Process Clause. *Id.* at 63, 99 S.Ct. at 2648.

The Supreme Court in *Barry* nevertheless found that the suspension was unconstitutional "[b]ecause that statute as applied in this case" did not "assure[] a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay." *Id.* at 66, 99 S.Ct. at 2650. The Court concluded that the balance of the *Mathews* factors shifted once the suspension had been imposed. At that point,

> the trainer's interest in a speedy resolution of the controversy becomes paramount, it seems to us. We discern little or no state interest . . . in an appreciable delay in going forward with a full hearing. On the contrary, it would seem as much in the State's interest as [the trainer's] to have an early and reliable determination with respect to the integrity of those participating in state–supervised horse racing.

*Id.* at 66, 99 S.Ct. at 2650.[13]

A similar shift in the balancing of factors occurs in this case once suspensions have been imposed. The suspended firefighter has an important interest in a prompt hearing and decision, and the City has no interest in any delay. If the employee is found to be in violation of the residency ordinance, it is in the public interest that he be discharged; if he is not in violation, it is to everyone's benefit that he return to work as soon as possible.

The order granting a preliminary injunction is reversed and the case is remanded to the district court to consider whether or not City procedures assure a prompt postsuspension hearing as required by the Due Process Clause. Circuit Rule 18 shall apply.

SPRECHER, Circuit Judge, dissenting.

I respectfully dissent on the basis that *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) governs the disposition of this case.

The issue as I see it is simply whether the suspension of City of Chicago firefighters for non–residency without either a presuspension or a prompt postsuspension hearing violates the Due Process Clause of the Fourteenth Amendment. I believe it does under *Barry v. Barchi*.

This appeal is from the granting of a preliminary injunction on behalf of three intervening fire lieutenants, enjoining the City and its agents from suspending them and "persons similarly situated in their employment as career–service employees of the Chicago Fire Department" prior to a hearing and decision of the Chicago Personnel Board.

I

It was stipulated that the intervenors "are permanent career service employees of the City of Chicago who cannot be disciplined, suspended or discharged without just cause . . . [who therefore] have a property interest in their job which . . . cannot

---

prior to the suspension of a firefighter for violation of Fire Department hair regulations. The Supreme Court granted certiorari, but later dismissed it as improvidently granted because "the city of Chicago had revised its rules to provide for presuspension hearings in all non-emergency cases." *Quinn v. Muscare*, 425 U.S. 560, 563, 96 S.Ct. 1752, 1753, 48 L.Ed.2d 165 (1976) (*per curiam*). The question of what effect this disposition had on the precedential value of our decision in *Muscare* is mooted by the Supreme Court's opinion in *Barry v. Barchi*,

443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), which we believe overrules *Muscare* on the presuspension-hearing issue.

13. The Supreme Court in *Mathews* also recognized that "'the possible length of wrongful deprivation . . . is an important factor in assessing the impact of official action on the private interests.'" *Mathews v. Eldridge, supra*, 424 U.S. at 341, 96 S.Ct. at 906, (quoting *Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975)).

be taken without due process of law." Tr. 72.

Section 25–30 of the Municipal Code of the City of Chicago provides that "officers and employees in the ... service of the city shall be actual residents of the city" and any such officer or employee "who shall fail to comply with the provisions of this section shall be discharged from the service of the city in the manner provided by law." The Chicago Fire Department regulations also define as an offense under Section 61.030, an employee's "failure to reside within the corporate boundaries of the City of Chicago." The City of Chicago Personnel Rules also provide that "[e]ach of these circumstances is a sufficient cause for disciplinary action against an offending employee: ... Failure to be an actual resident of the City of Chicago." Rule XVI, Section 1(u).

The Fire Commissioner established in the spring of 1978 a Division of Internal Affairs to investigate and determine the authenticity of numerous complaints that members of the Fire Department were non–residents. The policy within the Fire Department from May, 1978, to September 1, 1979, regarding residency, was that when complaints were received that an employee was not a resident, the employee was advised of the complaint and was encouraged to comply in the unspecified future. Tr. 114–15.

On August 15, 1979, the Fire Commissioner notified all members of the department that effective September 1, 1979, "any member found in violation of the residency requirement ... will be suspended by the Commissioner for thirty (30) days and charges will be filed with the Personnel Board of the City of Chicago seeking said member's discharge." Joint Ex. 7.

In other words, prior to the September 1, 1979, order by the Commissioner, time was given to comply, and if compliance was not forthcoming, charges of non–residency were filed before the Personnel Board and a full evidentiary hearing was held before the board, during which time the accused member of the department retained his position and remained on the payroll. Tr. 121, 144–45. Effective September 1, 1979, the member is suspended first and the "due process hearing" takes place thereafter.

## II

In *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the state board empowered to license horse trainers and others participating in harness horse–race meets in New York, issued rules forbidding the drugging of horses within 48 hours of a race and establishing a rebuttable presumption that the horse's trainer is responsible for unlawful drugging.

A horse trained by Barchi was determined by a postrace test to contain drugs, for which Barchi was suspended for 15 days. Under New York law a suspended licensee is entitled to a postsuspension hearing, but pending the hearing the suspension remains in full force and effect.

Barchi brought suit in the District Court which held the state procedure unconstitutional for permitting suspension without a presuspension or a prompt postsuspension hearing. The Supreme Court, with four justices disagreeing, upheld the state's imposition of interim suspension without a presuspension hearing, given the magnitude of the state's interest in regulating horse-racing.[1]

A unanimous Court, however, affirmed the District Court insofar as it held that due process requires a *prompt* postsuspension hearing. The Court said:

Yet, it is possible that Barchi's horse may not have been drugged and Barchi may not have been at fault at all. Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount, it seems to us. We also discern little or not state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing. On the con-

---

1. "In such circumstances, the State's interest in preserving the integrity of the sport and in protecting the public from harm becomes most acute." 443 U.S. at 65, 99 S.Ct. at 2649. *See also* at 71 n.3, 99 S.Ct. at 2652 n.3 (Brennan, J., concurring in part).

trary, it would seem as much in the State's interest as Barchi's to have an early and reliable determination with respect to the integrity of those participating in state–supervised horse racing.

In these circumstances, it was necessary that Barchi be assured a prompt postsuspension hearing, one that would proceed and be concluded without appreciable delay. Because the statute applied in this case was deficient in this respect, Barchi's suspension was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment.

*Id.*, at 66, 99 S.Ct. at 2650.

The New York statute providing for the postsuspension hearing "specifies no time in which the hearing must be held, and it affords the Board as long as 30 days after the conclusion of the hearing in which to issue a final order adjudicating a case." *Id.*, at 61, 99 S.Ct. at 2647.

In the present case, City of Chicago Personnel Rules provide that "the date for a hearing on discharge, demotion or suspension of more than thirty (30) days will be established with six calendar weeks of date of the notice of disciplinary action" and no time is specified within which the board shall render a decision. Rule XVI, Section 4(b)(1).[2]

This case fits squarely into the principle announced in *Barry v. Barchi* and I would affirm the District Court on that basis

---

**2.** The rule speaks of suspensions of *more* than 30 days and the intervenors were suspended for only 30 days. The rules also authorize indefinite suspension until the board hearing terminates with a resulting decision. Rule XVI, Section 4(b)(2). As a matter of practice, suspensions are indefinite in duration and board decisions ordinarily require more than six months from the time of filing of charges. App. 110, 112.

**3.** In *Muscare v. Quinn*, 520 F.2d 1212, 1215 (7th Cir.1975), a panel of this court which included Mr. Justice Clark and Mr. Justice (then Judge) Stevens held that:

Public employees facing temporary suspension for less than 30 days have interests qualifying for protection under the Due Process Clause, and due process requires at the minimum that they be granted a hearing prior to suspension where they may be fully

---

alone. Moreover, I would conclude that the city's interest in suspending a non–resident but experienced firefighter is so appreciably less than New York's interest in upholding the integrity of horse-racing and gambling thereon, that this case also constitutionally warrants a *presuspension* hearing.[3]

## III

The City has tried to create the illusion that an "informal hearing" was held in each case before charges were filed. Captain Ryan, the Director of Internal Affairs of the Chicago Fire Department, testified that prior to each intervenor's being served with notice of the charges against him, Ryan called each intervenor in and advised him that he had some evidence that indicated non–residency.

In the case of Lieutenant O'Boyle, for example, Ryan said that he learned that although O'Boyle's automobiles were registered to a Chicago address, one automobile was registered to a Palos Hills address. Tr. 82. Ryan then asked O'Boyle to come in, without telling him what the nature of their meeting was to be. O'Boyle guessed, however, that it might involve residency so he brought material with him. He testified:

A  I had everything that [I] thought imaginable for residency. I had everything–

informed of the reasons for the proposed suspension and where they may challenge their sufficiency.

In *Quinn v. Muscare*, 425 U.S. 560, 562–63, 96 S.Ct. 1752, 1753, 48 L.Ed.2d 165 (1976), the Supreme Court said:

... [a]fter the grant of certiorari, this Court was informed that the Civil Service Commission of the City of Chicago had revised its rules to provide for pre–suspension hearings in all nonemergency cases. While this voluntary rule change was subject to rescission, counsel for the petitioner candidly advised the Court at oral argument that even if the petitioner should prevail, it was very doubtful that the Commission would revert to its former suspension procedures.

In view of these developments, the writ of certiorari is dismissed as improvidently granted.

Q   Would you just describe the nature of the material that you had with you that you offered to submit to him?

THE COURT: Identify the documents.

BY THE WITNESS:

A   Well, I have the gas bills of where I live, my electric bills and all of my mail, my taxes, my water bill. I am separated from my wife. I have my separation papers, I had junk mail. I had everything that I thought would pertain to residence.

BY MR. SUGARMAN:

Q   Did you have income tax forms?

A   I had income tax forms, my driver's license, my other utilities and I got a composite of every bill that was paid since I moved into my building.

Q   When you say "my building," where is that?

A   Where I live.

Q   Which is where?

A   2535 W. 59th.

THE COURT: Do you own that building?

THE WITNESS: Yes, sir. My father and I own it.

THE COURT: What?

THE WITNESS: My father and I own the building.

BY MR. SUGARMAN:

Q   Didn't you offer that to Cpt. Ryan, that material you had with you?

A   Yes. I had it all in—I had electric bills in one section and gas bills in another section. Everything was prepared and ready to lay on the table.

Q   Did you offer that to him?

A   Yes, sir.

Q   Did he receive it? Did he accept it?

A   No, sir. He told me I would have my chance to show that at my hearing.

Q   Did he indicate to you what, if any, evidence he had against you?

A   No, sir. The only thing he talked about was that he had 40-some phone calls that somebody had called up and said that I was not a resident, and I said, "Well, I was No. 1 on the captain's list and it had a lot to do with that."

\*     \*     \*     \*     \*     \*

Q   How did that meeting end? What did he say to you and what did you say to him?

A   I said, "I've got my proof and so on and so forth." And he says, "Well, that is all that is necessary." He told me what was going to transpire.

Q   What did he say?

A   That I was going to be fired and they were going to seek my discharge—I mean, I was going to be suspended and they were going to seek my discharge to be fired. And I say, "Okay. Is that it?" And he says, "Yes." And I walked out of the room. It was only a matter of 5, 6 or 7 minutes.

Tr. 175–79.

Captain Ryan conceded that none of the intervenors was given notice of the nature of the meeting with him. Tr. 113, 167. *See also* Tr. 173–74. He admitted that at the time of each meeting no charges had yet been filed (Tr. 166), complaining witnesses were not identified (Tr. 141), specifics of the proposed charges were not revealed (Tr. 140–41), no statements were taken (Tr. 133), and the person brought in was not told what type of evidence he should submit (Tr. 156–57). The person whom Ryan met with was not told to bring an attorney, was not confronted with witnesses or specific evidence or charges, nor in fact was anything in the way of due process provided. Each person was simply told that he was about to be suspended and that he would be accorded a postsuspension hearing. Since Ryan was the investigator who instituted the eventual charges, he could hardly be characterized as an unbiased presiding officer.

Under the very minimum tests for evaluating a presuspension hearing, the Ryan–intervenor meetings could not possibly qualify. *Goldberg v. Kelly*, 397 U.S. 254, 266–71, 90 S.Ct. 1011, 1019–22, 25 L.Ed.2d 287 (1970). Furthermore, in requiring a prompt postsuspension hearing in *Barchi*, the Court nevertheless noted that Barchi "was given more than one opportunity to present his side of the story to the State's investigators." 443 U.S. at 65, 99 S.Ct. at 2649.

## IV

Finally, there is the question of whether the intervenors were irreparably harmed by the suspension in order to warrant the granting of the preliminary injunction.

In *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), a federal probationary employee was terminated after four months' service for insubordination. In the course of its opinion, the Supreme Court said:

> We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual.

*Id.* at 92 n.68, 94 S.Ct. at 953 n.68.

This strong and seemingly conclusive language must be read in its full context. First, it appears in a footnote. The corresponding language in the body of the opinion is far less encompassing:

> Assuming for the purpose of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case.

*Id.*, at 91–92, 94 S.Ct. at 953.

"This type of case" is a federal probationary employee terminated after four months' service for insubordination. The balance of the footnote language also indicates that the sweeping language of the footnote is limited to the facts of "this type of case."

> But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, *when discharge of probationary employees is an issue*, should be reserved for that situation rather than employed in the routine case.

*Id.*, at 92 n.68, 94 S.Ct. at 953 n.68 (emphasis added).

Recently, both the Fifth and Eighth Circuits have sought to limit the effect of *Sampson's* footnote language to federal probationary employees. *Garza v. Texas Educational Foundation, Inc.*, 565 F.2d 909, 911 (5th Cir.1978); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 712 (8th Cir.1979).

In addition, the Court in *Sampson* relied upon the federal Back Pay Act, 5 U.S.C. § 5596, saying:

> This Act not only affords monetary relief which will prevent the loss of earnings on a periodic basis from being "irreparable injury" in this type of case, but its legislative history suggests that Congress contemplated that it would be the useful, if not the exclusive, remedy for wrongful discharge.

*Id.*, at 90–91, 94 S.Ct. at 952–953.

In the present case, we have city non-probationary permanent employees. All three of the intervenors are lieutenants earning $2,000 per month and with tenure of 29 years, 15 years and 13 years. App. 85, 103, 105. They are not charged with insubordination but with non-residency. Whereas "the government's interest in being able to act expeditiously to remove and *unsatisfactory* employee is substantial," *Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (emphasis added), the state's interest in acting expeditiously to remove experienced and useful employees is nonexistent. For example, Lieutenant O'Boyle was number one on the captain's promotion list, meaning that he competed with some 500 individuals in a competitive examination and was graded the highest of all. App. 93. In October, 1977, O'Boyle received the Lambert Tree Award, the highest award the City of Chicago bestows once a year for an act of heroism. App. 93–94. O'Boyle also received five other awards for heroism. App. 94.

Finally, under my view of this case, the intervenors would be denied due process unless the granting of the preliminary in-

junction was affirmed. Deprivation of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976).

I would affirm the judgment.