NATIONAL FARMERS' ORGANIZA-
TION, INC., et al., Plaintiffs,

v.

John R. BLOCK, et al., Defendants.

Civ. A. No. 82-C-1602.

United States District Court,
E.D. Wisconsin.

April 20, 1983.

Daniel A. Milan, Asst. Atty. Gen., Madison, Wis., Jon K. Murphy, Asst. Atty. Gen., St. Paul, Minn., George M. St. Peter, Fond du Lac, Wis., amicus curiae.

James A. Urdan, Milwaukee, Wis., and Richard A. Green, and John P. McKenna, Washington, D.C., for plaintiffs.

Joseph P. Stadtmueller, U.S. Atty. by Jan E. Kearney, Asst. U.S. Atty., Milwaukee, Wis., and Dennis Linder, Stephen E. Hart, Kevin Kovacs, Dept. of Justice, Civil Division, Washington, D.C., for defendants.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This suit presents a challenge to § 101 of the Omnibus Budget Reconciliation Act of 1982, Pub.L. No. 97–253, 96 Stat. 763 (amending the Agricultural Act of 1949, § 201, 7 U.S.C. § 1446), and to the regulations promulgated by the defendant Secretary of Agriculture to implement that statute. As amended, 7 U.S.C. § 1446(d)(2) authorizes the Secretary to deduct 50 cents per hundredweight from the proceeds of sale of all milk marketed commercially by producers to offset a portion of the cost of the milk price support program. This authority is effective only between October 1, 1982 and September 30, 1985, and only for fiscal years in which the Secretary estimates that net price support purchases of milk or the products of milk would be at least 5 billion pounds milk equivalent.

The plaintiffs in this action are the National Farmers' Organization, Inc. (NFO), which is a national organization of agricultural producers, the NFO Members' Dairy Custodial Account, which is an Iowa Trust established to receive, manage, and distribute to NFO members the proceeds of the sale of their milk, and three Wisconsin dairy farmers who are members of the NFO. The defendants are the Secretary of Agriculture and the United States Department of Agriculture. The State of Wisconsin, the State of Minnesota, and the Associated Milk Producers, Inc. appeared as amicus. On April 15, 1983, the Court heard argument on the plaintiffs' motion for a preliminary injunction. This constitutes the Court's findings of fact and conclusions of law on plaintiffs' motion.

## I. STATUTORY AND REGULATORY BACKGROUND

The production and marketing of milk and milk products begins with the dairy farmer, or "producer," who milks his cows and transports the liquid milk to a processor or manufacturer. See 7 C.F.R. §§ 1002.5, 1002.6. The processor, also called a "handler," either prepares and packages the milk as drinking milk, or manufactures it into soft (cottage cheese, sour cream, ice cream) or hard (butter, cheese, powdered milk) dairy products. See 7 C.F.R. § 1002.-7.

The Agricultural Act of 1949, 7 U.S.C. § 1421 et seq., authorizes federal support of milk prices through government purchases of milk products. The purposes of the price support program are:

to assure an adequate supply of pure and wholesome milk to meet current needs, reflect changes in the cost of production, and assure a level of farm income adequate to maintain productive capacity

sufficient to meet anticipated future needs.

7 U.S.C. § 1446(c). The Secretary of Agriculture supports the price of milk, not by paying direct subsidies to or buying liquid milk directly from producers, but by standing ready to purchase unlimited quantities of milk products at announced prices. This is accomplished through the Commodity Credit Corporation (CCC), a federal corporate entity within the United States Department of Agriculture created under 15 U.S.C. § 714. The CCC purchases surplus butter, cheese, and nonfat dry milk, effectively creating a floor for the prices of those products and, indirectly, a floor for the price of all milk and milk products. By creating this guaranteed market for dairy products, the federal government has sought to encourage adequate milk production, thereby assuring American consumers of adequate milk supplies. *Id.*

In recent years, however, the high level of federal price support has caused milk production to greatly exceed consumer demand. The price support level, for example, has risen from $7.24 per hundredweight established in 1975 to $13.10 per hundredweight established in 1980. Because of the CCC price support purchases, American dairy farmers receive a substantially higher price for their product than they would if left to the forces of the marketing place. Indeed, the price they receive is approximately 1½ to 2 times the world market price. Producers, therefore, have been encouraged to expand their production far in excess of commercial market demand.

Consequently, government purchases of surplus dairy products have increased dramatically. In the past two dairy marketing years, the CCC has purchased the equivalent of about 10 percent of all milk produced in the nation. In 1982, the CCC purchased approximately sixty-eight percent of all nonfat dry milk, thirty percent of all butter and twenty-two percent of all American cheese produced in this country. As of November 12, 1982, the CCC had inventories of over 400 million pounds of butter, 790 million pounds of cheese, and 1.2 billion pounds of nonfat dry milk. The total cost of the CCC's current inventories is rapidly approaching $3 billion, and the annual storage costs are approximately $50 million per year. In Fiscal Year 1982 alone, the federal government spent in excess of $2.2 billion to support milk prices through the purchase of surplus milk products.

As part of the overall effort to control federal spending, and to reduce the huge government expenditures to purchase these vast amounts of surplus dairy products, Congress enacted certain amendments to the milk price support system as part of the Omnibus Budget Reconciliation Act of 1982, Pub.L. No. 97–253, 96 Stat. 763. On September 8, 1982, less than a month before the beginning of the dairy industry's 1982–83 fiscal year, the Act was signed into law. The dairy provisions of that Act, amending 7 U.S.C. § 1446, affected the milk price support system in three respects. First, Congress established that from October 1, 1982 to September 30, 1985, the price of milk shall be supported at not less than $13.10 per hundredweight of milk containing 3.67 per centum milk fat. 7 U.S.C. § 1446(d)(1). Second, Congress authorized the 50 cent deduction challenged in this suit.

> Effective for the period beginning October 1, 1982, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Commodity Credit Corporation to offset a portion of the cost of the milk price support program. Authority for requiring such deductions shall not apply for any fiscal year for which the Secretary estimates that net price support purchases of milk or the products of milk would be less than 5 billion pounds milk equivalent.

7 U.S.C. § 1446(d)(2). Third, Congress authorized the Secretary to impose an additional 50 cent deduction effective April 1, 1983, that would be refundable to producers who reduced their commercial marketings from some base period amount. 7 U.S.C. § 1446(d)(3).

The Secretary published on September 24, 1982, a Notice of Determination in the Federal Register announcing the congressionally established price of $13.10 per hundredweight and further providing that

> beginning December 1, 1982, 50 cents per hundred weight shall be deducted from the proceeds of sale of all milk marketed commercially by producers to offset a portion of the cost of the milk price support program.

47 Fed.Reg. 42128 (Sept. 24, 1982). The Notice of Determination also provided that:

> Since the level of support becomes effective October 1, 1982, it has been determined that this notice should be issued without prior opportunity for public comment in order that producers, handlers, and others might be informed of these determinations as soon as possible.

47 Fed.Reg. 42128.

Simultaneously with the publication of the Notice of Determination, the Secretary published a proposed rule regarding the procedure for implementing these changes in the milk price support system. 47 Fed. Reg. 42112 (Sept. 24, 1982). In the proposed procedural rule, the Secretary invited public comments for 45 days on "whether the dairy collection plan should be implemented in the manner set forth in this proposed rule . . . ." *Id.* The final rule was published on November 30, 1982, 47 Fed.Reg. 53831 (Nov. 30, 1982), and was substantially the same as the proposed rule published in September.

The deduction program pursuant to the September 24, 1982 Notice of Determination and the November 30, 1982 final rule was never implemented. The United States District Court for the District of South Carolina issued a temporary restraining order on December 21, 1982, enjoining the implementation, and on January 11, 1983, issued a preliminary injunction against the deduction. *South Carolina v. Block,* 558 F.Supp. 1004 (D.S.C.1983). The decision was based on the Secretary's failure to follow the notice and comment procedures of the Administrative Procedure Act (APA), 5 U.S.C. § 553, in promulgating the rule.

In response to the decision of the South Carolina District Court, the Secretary instituted a rulemaking proceeding in which he proposed to implement both the first and second stage deductions authorized by the Act by imposing a total $1 per hundredweight deduction from the proceeds of all milk sales. Notice of the rulemaking was published in 48 Fed.Reg. 3764 (January 27, 1983). After observing a 30 day comment period, the Secretary published a final rule imposing only the first 50 cents per hundredweight deduction. *See* 48 Fed.Reg. 11253 (March 17, 1983). The rule was made effective on April 16, 1983.

## II. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

Plaintiffs' motion for a preliminary injunction seeks to enjoin the enforcement of the final rule implementing the deduction program. First, the plaintiffs challenge the statute authorizing the 50 cent deduction as an unconstitutional delegation of legislative power. Second, they argue that the Secretary was arbitrary and capricious and that he abused his discretion in promulgating the rule implementing the 50 cent deduction, and that the Court should therefore declare the rule invalid under APA § 10, 5 U.S.C. § 706(2)(A).

The prerequisites to the issuance of a preliminary injunction are well established. The party seeking the injunction must establish: 1) a reasonable likelihood of success on the merits; 2) irreparable harm and the lack of an adequate remedy at law; 3) that the threatened harm to the plaintiff outweighs the threatened harm to the defendant; and 4) that the granting of the injunction will not disserve the public interest. *E.g. Menominee Rubber Co. v. Gould, Inc.,* 657 F.2d 164, 165–66 (7th Cir.1981).

For the Court to issue a preliminary injunction, the plaintiffs must establish each of the four factors listed above. The Court rejects the plaintiffs' argument that a sufficiently strong showing on the merits will justify issuance of a preliminary injunction even though irreparable injury is only a possibility. *See* Plaintiffs' Memorandum of

Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction 4–5. "'A preliminary injunction is an extraordinary remedy which is not available unless the plaintiffs carry their burden of persuasion as to *all* of the prerequisites.'" *Ciechon v. City of Chicago,* 634 F.2d 1055, 1057 (7th Cir.1980) (quoting *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096 (7th Cir.1976)) (emphasis added by *Ciechon* court). Thus, while the court must weigh the four factors, and while no one factor is determinative, the plaintiff must carry its burden as to each factor before the Court can issue a preliminary injunction.

## III. REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Unconstitutional Delegation of Legislative Power

Plaintiff argues that 7 U.S.C. § 1446(d)(2), authorizing the Secretary to make the 50 cents per hundredweight deduction, is an unconstitutional delegation of legislative authority because the Congress has neither provided the Secretary with any standards as to when the deduction should be implemented nor articulated the policy to be followed. Plaintiffs rely heavily on *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the first case in which the Supreme Court struck down a statute as an excessive delegation of legislative power.

The statute struck down in *Panama Refining Co.* was § 9(c) of the National Industrial Recovery Act. That section authorized the president to prohibit the transportation of "hot" oil, petroleum products produced in violation of state laws. The Supreme Court held that because the question of whether the transportation of hot oil shall be prohibited by law was obviously one of legislative policy,

we look to the statute to see whether the Congress has declared a policy with respect to that subject; whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in

the exercise of the authority to enact the prohibition.

293 U.S. at 415, 55 S.Ct. at 246. The Court found that the Congress had not declared a policy as to when the President should prohibit the transportation of hot oil, that it did not establish any standards to govern the President's actions, and that it did not require that the President make any finding before acting to prohibit the transportation of hot oil. For those reasons, the Court held that § 9(c) represented an unconstitutional delegation of legislative power from the Congress to the President.

Although the delegation doctrine established by *Panama Refining Co.* remains a limit on congressional delegation of authority to administrative agencies or the executive, the Court has upheld statutes containing only vague standards and statements of policy and delegating very broad discretion. *See Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Since the 1935 case of *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), no federal court has invalidated a congressional statute on the ground that it was an excessive delegation of legislative power. Breyer & Stewart, Administrative Law and Regulatory Policy 84 (1979). In *Yakus,* the Court upheld the Emergency Price Control Act of 1942, which delegated broad authority to the Price Administrator who headed the Office of Price Administration. The Administrator was authorized to promulgate regulations fixing prices of commodities which "in his judgment will be generally fair and equitable and will effectuate the purposes of this Act," when, in his judgment, the prices "have risen or threatened to rise to an extent or in a manner inconsistent with the purposes of the Act." 321 U.S. at 420, 64 S.Ct. at 665. The Court examined the Act as a whole and found that the Act contained standards, a statement of purposes, and required a finding before exercise of the discretion and therefore was not an unconstitutional delegation.

■ This Court holds that read as a whole, the Agricultural Act of 1949, as

amended, contains a sufficient statement of policy regarding milk price supports and an adequate delineation of standards, and requires specific findings of fact before the exercise of discretion, so that 7 U.S.C. § 1446(d)(2) is not an unconstitutional delegation of legislative authority. The purposes of the milk price support program are set out in 7 U.S.C. § 1446(c):

> to assure an adequate supply of pure and wholesome milk to meet current needs, reflect changes in the cost of production, and assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs.

Further, the Secretary is directed by 7 U.S.C. § 1446c–1 to reduce dairy product inventories and expenditures for price support:

> The Secretary of Agriculture shall utilize [available authorities] to reduce inventories of dairy products held by the Commodity Credit Corporation so as to reduce net Commodity Credit Corporation expenditures to the estimated outlays for the milk price support program . . . .

The legislative history to the Omnibus Budget Reconciliation Act of 1982 also clearly demonstrates that the amendment to the Agricultural Act was designed to reduce the cost of the price support program. 128 Cong.Rec. 510762 (daily ed. Aug. 18, 1982).

The discretion of the Secretary, while broad, is hardly without limitations. Section 1446(d) specifies the exact nature and amount of the deductions, and the use of the proceeds. 7 U.S.C. § 1421 lists eight factors applicable to the milk price support program that the Secretary should consider in establishing levels of price supports. Finally, § 1446(d)(2) conditions the Secretary's authority to impose the deduction on the Secretary's finding that estimated price support purchases of milk products would be at least 5 billion pounds milk equivalent. It is true that the law does not dictate that the Secretary impose the deduction upon making such an estimate. If it did, the Secretary would have no discretion in im-

posing the deduction. Nonetheless, the requirement that the Secretary estimate that the net price support purchases will be at least 5 billion pounds milk equivalent before imposing the deduction does provide a limit relevant to the analysis of the delegation doctrine under *Panama Refining Co.*

Because the Court finds that the Congress has not unconstitutionally delegated legislative authority through § 101 of the Omnibus Budget Reconciliation Act of 1982, the plaintiffs have failed to show any likelihood of success on the merits of their delegation doctrine argument.

B.  Arbitrariness and Abuse of Discretion

The plaintiffs argue that even if the authorizing legislation was constitutional, the Secretary acted arbitrarily and capriciously, and abused his discretion in deciding to promulgate rules to implement the 50 cent deduction, and that therefore this Court should find the rule invalid under APA § 10, 5 U.S.C. § 706. Plaintiffs make three arguments as to why the rulemaking was arbitrary. First, they argue that the Secretary failed to consider all relevant factors before imposing the deduction, particularly the impact the deduction would have on many farmers. The plaintiffs allege that the Secretary's only considerations were revenue considerations. Second, plaintiffs argue that the Secretary erroneously took a narrow view of his authority under § 1446(d) and thereby failed to consider alternatives to the deduction that were available to him. Third, plaintiffs claim that the Secretary failed to provide a reasoned response to significant comments filed in opposition to the rule as is required in promulgating a final rule.

■ The scope of judicial review under APA § 10 to determine whether agency action was arbitrary, capricious, or an abuse of discretion is narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Id.* "The agency must articulate a 'rational connection between the facts found and the choice made.' *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, ... we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citations omitted).

█ In this action, the administrative record indicates that the Secretary did consider the relevant factors, and while the Secretary's explanation as to why the impact of the 50 cent deduction on farmers did not outweigh the need for the deduction is of less than ideal clarity, the agency's path to its decision may be reasonably discerned. The Court finds a rational connection between the facts found and the choice to impose the deduction, and therefore cannot find that the Secretary's imposition of the deduction violated APA § 10.

In the publication of the final rule, 48 Fed.Reg. 11253 (daily ed. Mar. 17, 1983), the Secretary's comments indicate that his decision setting the price support level and imposing the 50 cent deduction was made with the goals of the price support program and the goals of the deduction in mind. One of the goals of the price support program is to assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs. In the Dairy Policy Statement by Agriculture Secretary John R. Block, March 16, 1983, at 5–6, the Secretary addressed concerns that a decrease in the support price would lead to more production, that lower supports would affect small dairymen more than the large, and that only those regions that produce surplus dairy products and sell to the government are a problem. The Initial Regulatory Flexibility Impact Analysis, January 24, 1983, at 2, 6, also consider the effects the proposal would have on small farmers.

In the Notice of Proposed Determination, 48 Fed.Reg. 3764, 3765 (daily ed. Jan. 27, 1983), the Secretary determined that the 50 cent deduction represented less than 4 percent of producer gross income from milk. He further concluded that:

The proposal will not affect the promotion of increased use of dairy products. The proposal will assure an adequate supply of milk and dairy products and will encourage efficient production units consisting of high-grade, disease-free cattle and modern sanitary equipment. It also will assure dairy farmers as a whole of a fair return for their labor and investment while assuring an adequate supply of pure and wholesome milk to meet current needs. The proposal will assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs. The proposal also reflects the recent reduction in the cost of feed and increased efficiency in production. Some marginal operators may not be able to profit under the proposal but the statute does not guarantee each and every dairy farmer a profit while requiring the accumulation of huge CCC stock of surplus dairy products.

48 Fed.Reg. at 3765–66. Although this summary is not a detailed quantitative analysis, it reflects the Secretary's consideration of the effect the deduction would have on farmers as relevant to the goals of the price support system.

The Secretary's consideration of the impact the deduction would have on farmers is also reflected in other parts of the administrative record. In the Final Regulatory Impact Analysis, March 14, 1983, at 4, the agency concluded that cash receipts from dairy farming with the 50 cent deduction would be $18.3 billion in 1982–1983, as compared to $18.2 billion in 1981–1982. In the Final Determination, 48 Fed.Reg. 11254 (daily ed. March 17, 1983), the Secretary acknowledged that some individual producers would be more seriously affected than others and that the areas of greatest production would be most affected. However,

he also noted that since the regulation was now going into effect only from April 16, 1983 through September 30, 1983, the effect on producers' income would be half of that estimated in the first round of rulemaking.

The plaintiffs do not dispute that the Secretary adequately considered the severity of the problem of excessive price support purchases and the ballooning cost of the price support program. The plaintiffs claim that the Secretary imposed the deduction even though he did not think it would work, which would indeed be arbitrary. But that is not an accurate reflection of the Secretary's view. The Secretary did not believe that the deduction would eliminate the problem, but he estimated that it would at least put a dent in the problem. The final determination indicates that 1983 production levels would be up 3.6 billion pounds from fiscal year 1982 levels without the 50 cent deduction, while they would be up 3.2 billion pounds with the deduction. It further estimates that without the deduction, net CCC outlays would be $2,496 million, while with the deduction, net CCC outlays would be $2,109 million.

The Secretary balanced the factors in favor of the deduction and against the deduction. The Final Regulatory Flexibility Analysis, March 15, 1983, at 4, explicitly recognized this balancing: "[T]o the extent that the impact of this alternative [upon farmers] might be reduced, the intended effects of this program would in turn be reduced." The Analysis also recognized that the 50 cent deduction would have a significantly reduced effect on the small producer and handler than would the $1.00 deduction.

The Secretary also adequately considered his alternatives. He considered imposing no deduction, a 50 cent deduction, and a $1.00 deduction with a refund program. The Court rejects plaintiffs' arguments that the Secretary had authority under 7 U.S.C. § 1446 to impose less than the 50 cent deduction or to attach some form of incentive program to the first 50 cent deduction authorized by that statute. To so interpret the statute would make the plain language of the statute meaningless. The Secretary did examine those alternatives that were within his power. The final determination explains why the Secretary rejected the alternatives of increased donations, increased exports or decreased imports, and exemption of various classes. 48 Fed.Reg. 11254. Block's Dairy Policy Statement of March 16, 1983, examines more closely the export and donations alternatives, as well as a base plan and incentive program.

Finally, the plaintiffs argue that the Secretary failed to adequately consider significant comments made by the NFO. These comments related principally to the economic impact of the deduction. However, the Court holds that the Secretary did adequately respond to significant comments raised. In this case, the Secretary received over 30,000 comments on the proposed deduction program. Many of the comments were duplicative. Although the Secretary did not specifically respond to each comment made, he did generally respond to those comments he considered most significant. This is all he was required to do. *See Consumers Union of United States, Inc. v. Consumer Product Safety Commission,* 491 F.2d 810, 812 (2d Cir.1974); *Kennecott Copper Corp. v. EPA,* 462 F.2d 846, 850 (D.C. Cir.1972).

In summary, the Court holds that despite the shortcomings of the Secretary's analyses and explanations, the Secretary did consider relevant factors and did articulate a rational connection between the facts found and the choice made. The plaintiffs have failed to establish that the Secretary was arbitrary or that he abused his discretion, thereby violati APA § 10.

## IV. CONCLUSION

Because the Court finds that the plaintiffs have shown no reasonable likelihood of success on the merits, it is unnecessary for the Court to consider whether the plaintiffs have established the other prerequisites to the issuance of a preliminary injunction. The plaintiffs' motion must be denied.

THEREFORE, IT IS ORDERED that the plaintiffs' motion for a preliminary injunction is denied.

IT IS FURTHER ORDERED that this case be dismissed unless the plaintiffs notify the defendants and the Court within sixty (60) days that they wish to continue with this action.