**LCN ENTERPRISES, INC., d/b/a Fast Lane Biker, Pamela Mazalatis, Mark Ruzicka and Wallace Dykeman, Plaintiffs,**

v.

**CITY OF ASBURY PARK, Mayor Kenneth (Butch) Saunders, Charles Rouse, and Police Captain Thomas McDonald, Defendants.**

**City of Asbury Park, a municipal corporation of the State of New Jersey, Plaintiff,**

v.

**LCN Enterprises, Inc., d/b/a Fast Lane Biker, Defendant.**

**Civil Action Nos. 02–1048(MLC), 02–1049(MLC).**

United States District Court, D. New Jersey.

March 14, 2002.

As Amended April 5, 2002.

Mary Lou Delahanty, Szaferman, La-kind, Blumstein, Watter, Blader, Lehmann & Goldshore, P.C., Lawrenceville, NJ, for Plaintiffs.

Mitchell J. Ansell, Ansell, Zaro, Grimm & Aaron, Ocean Township, NJ, for Defendants.

## MEMORANDUM OPINION

COOPER, District Judge.

This consolidated action is before the Court on cross-motions for preliminary in-

junction. Plaintiff LCN Enterprises, Inc. ("LCN") seeks to enjoin defendant City of Asbury Park ("City"), from cancelling its agreement to allow LCN to rent Convention Hall in Asbury Park for an event named Fast Lane Biker All American Cycle Jam ("event") which is scheduled for Saturday and Sunday, March 16 and 17, 2002. The City seeks an injunction permitting the event to be cancelled. This Court has reviewed the written submissions of the parties and conducted an expedited evidentiary hearing with oral argument. For the reasons stated here, we will deny LCN's motion and will grant the City an injunction directing that the event be cancelled.

*BACKGROUND AND PROCEDURAL HISTORY*

Plaintiff LCN Enterprises Inc. is a publisher of magazines engaged in business in Monmouth County, New Jersey, where the City of Asbury Park is located. LCN does business under the name "Fast Lane Biker," and publishes a magazine of the same name. In September, 2001, LCN entered into an agreement permitting LCN to rent Convention Hall in Asbury Park to conduct the event on March 16–17, 2002 ("rental agreement"). As of February 14, 2002, the City accepted a $2,800 payment from LCN pursuant to the rental agreement.[1]

The upcoming event has been widely advertised by both the City and LCN. Eight Harley–Davidson dealerships have become sponsors, and LCN has accepted fees from vendors and others who have paid to participate in various portions of the event. LCN has also obtained a $2 million insurance policy naming the City as additional insured, as required under the rental agreement. The hours of operation are scheduled for 11:00 a.m. to 6:00 p.m. on both Saturday, March 16 and Sunday, March 17.

On or about March 1, 2002, LCN was notified by the City that it was seeking to cancel the event and rescind the rental agreement, based upon information received by the City and other law enforcement officials that there was a likelihood of violence among rival motorcycle clubs, specifically the Pagans, the Hells Angels, and the Breed. LCN did not agree to rescind, and at the City Council meeting on March 6, 2002, the City directed its attorney to seek judicial approval to cancel the event.

The City filed a verified complaint in the Superior Court of New Jersey, Chancery Division, seeking a preliminary injunction preventing LCN from conducting the event. That complaint was filed and served upon LCN on March 8, 2002, and LCN removed it to this Court on March 11, 2002. (Notice of Removal in Civ. No. 02–1049.) On that same date, LCN and others ("the LCN parties") filed in this Court an original action against the City and certain of its officials, (collectively referred to as the "City") seeking various relief including an injunction prohibiting the City from cancelling the event. (Complaint, Civ. No. 02–1048.) We commenced hearing oral argument on the injunctive issues on March 12, and conducted an evidentiary hearing on an expedited basis on March 13. Consolidation of the two cases was ordered on March 12 by consent of the parties.

---

**1.** There was a written rental agreement which was signed by the City as of February 14, 2002 (P–12), but LCN contends that the City did not advise LCN that the contract had been signed until this dispute arose. We need not further define the nature of the contract for present purposes, because the parties agree that the essential terms of the agreement were understood between them as of September, 2001.

*PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW*

This Court has original jurisdiction of the claims asserted by the LCN parties under the First and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(a)(3). For purposes of this injunctive stage of the proceedings, we will also assume that the Court has supplemental jurisdiction over the related state law claims of any party pursuant to 28 U.S.C. § 1367(a).

▇▇▇▇ Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988) (citing *United States v. City of Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980)). Under well-established law governing the granting of preliminary injunctive relief, the Court must consider whether: (1) the party seeking a preliminary injunction has shown a reasonable probability of success on the merits; (2) the party will be irreparably injured by the denial of the relief; (3) granting preliminary relief will result in even greater harm to the nonmoving party; and (4) granting the preliminary relief will be in the public interest. *See, e.g., ACLU v. Reno,* 217 F.3d 162, 172 (3d Cir.2000); *ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc) (citations and quotation omitted). When relevant, a Court must also consider possible harm to interested third parties. *See, e.g., Oburn v. Shapp,* 521 F.2d 142, 152 (3d Cir.1975). "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT & T Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994).

I. *Reasonable Probability of Success on the Merits*

▇▇▇▇ Under the standard for preliminary injunctive relief, the party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation." *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir.1982). In evaluating whether a moving party has satisfied this first part of the preliminary injunction standard, it must be remembered that "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that it will prevail on the merits." *Oburn v. Shapp,* 521 F.2d 142, 148 (3d Cir.1975).

The procedural posture of these consolidated cases is such that the parties on both sides of this controversy are moving for preliminary injunctive relief: the City filed first, seeking judicial authorization to rescind the rental agreement and cancel the event; and the LCN parties filed next, seeking to enjoin the City from cancelling. Technically, then, each moving party may have the burden to establish its right to the injunction it seeks. However, as the Court views the present injunctive dispute, the paramount issues concern whether the LCN parties will suffer the deprivation of their First Amendment free speech rights or their Fourteenth Amendment due process rights, as pleaded in Count One of their Complaint, if the City proceeds with its plan to cancel the event. Therefore, we will focus primarily upon the constitutional issues thus raised by the LCN parties and will regard them as the moving party for purposes of this discussion.

*Description of the Facility and the Planned Event*

Asbury Park is an oceanfront community located at the New Jersey shore.

According to the event publicity, it is "centrally located only 45 minutes from Philadelphia, New York City and Atlantic City." (D–4, center pg.) It is also due east of the state capital, Trenton; and Bucks County, Pennsylvania is immediately west of Trenton across the Delaware River.

Convention Hall ("the Hall") is a large oceanfront structure with limited street access. There are approximately five establishments holding liquor licenses within walking distance, and the rest of the area consists of two municipal parks, some light commercial uses along the adjacent Ocean Avenue, and the rest residential. (McDon.) The Hall has a large ground floor, with an adjoining theater area that is not part of the rental agreement. The Hall also has a large second floor in the form of a spectators balcony, which is accessible by several stairways but is closed to visitors due to inoperable elevators. There is a main entrance in the front of the Hall, and there are numerous fire exit doors on all sides of the building. (P–2 to –9; D–2 and –3.) The fire code capacity of the Hall is 3,590 people.

The City has long been a place for motorcycle enthusiasts to attend outdoor events in large numbers, and none of those have erupted in violence. (Clark, McD., Maz.) There have been other organized events in the City, both in and out of the Hall, and those have been free of violence as well. But the City has endured violence in some crowd settings, particularly during an annual influx of visitors called Greekfest. The City officials, including fire and police, therefore have considerable experience dealing with security issues involving large gatherings. (McD.)

Plaintiff Pamela Mazalatis is an Asbury Park resident who is the president and sole shareholder of LCN, which has published a free advertising magazine named Fast Lane Biker for one year. The magazine distributes 10,000 copies monthly, ten months a year, throughout central New Jersey. The publisher of the magazine is listed as "Frank Dracman." Ms. Mazalatis explains that is a pen name for plaintiff Mark Ruzicka. Mr. Ruzicka owns an exotic dancing establishment in Long Branch, and works with Ms. Mazalatis in the preparation and promotion of the magazine. (Clark, Maz.) Mr. Ruzicka is a member of the Breed Motorcycle Club. (Maz.) The upcoming event, named "Fast Lane Biker All American Cycle Jam," is organized by LCN and promoted by the magazine. (D–4.) It is LCN's first event.

An event such as this is commonly referred to as a cycle show or "swap meet." (Clark.) Planned features of this event include exhibition of motorcycles with judging of best in each class; vendor sales of new cycle parts, clothing and accessories, and displays of services such as custom painting; band music and refreshments; and a "Miss Cycle Jam Bikini Contest." (D–4, center pg.; Maz.) No advance ticket sales have been offered, so there is no count of expected participants. However, based on conversations with an organizer of other such events, Ms. Mazalatis hopes that at least 1,000 guests will attend each day, in addition to the vendors, competitors, sponsors, bands, etc. She states that LCN has advertised the event widely in print, radio and web media so as to attract a large turnout.

LCN has accepted registration fees of $100 each from 51 vendors; $25 each from 40 cycle show entrants; and sponsorship fees of $250 each from eight Harley-Davidson dealerships in New Jersey. Those renting a booth for the event include a New Jersey attorney, Jerry Friedman, Esq. His certification states that his practice includes representing motorcycle riding clubs and that at his booth he plans

to distribute materials and talk to patrons on legislative and policy issues of interest to motorcycle riding groups and enthusiasts. Mr. Friedman certifies that "these events provide an opportunity for the exchange of ideas concerning issues affecting the motorcycle community in New Jersey." (P–1.)

*The Investigation*

Detective Jason Clark is a former Wall Township police officer who is currently a detective in the Monmouth County Prosecutor's Office. He acquired expertise regarding "outlaw motorcycle clubs" during an extended investigation of the Breed club in New Jersey during 1996–1999, which led to some arrests and convictions on charges of drug and firearms trafficking. During that period he also investigated other motorcycle clubs named the Hells Angels and the Pagans. He testified at length at the injunctive hearing concerning certain typical aspects of such clubs, and provided the results of his current investigation and his expert opinion relevant to this case. The following narrative is drawn from his testimony and his certification.

On Saturday, February 23, 2002, the Hells Angels sponsored a motorcycle swap meet and tattoo show at a rented catering hall in Plainview, Suffolk County, New York, which was called the Hell Raisers Ball ("the Long Island incident"). The Pagans were not invited to the event and were not welcome. Members of the Pagans stormed the event, and in the ensuing melee one of the Pagans was shot and killed and other participants sustained injuries in the fighting. At least 73 Pagans were arrested at the scene, along with the one Hells Angel who was the alleged shooter. Of those, only three were New Jersey residents. This incident occurred while members of law enforcement were present, shortly after a larger police presence had left. Racketeering charges have been lodged in New York against the Pagans members arrested in that incident.

Detective Clark testified that the term "outlaw motorcycle club" is used by law enforcement but is also used by many groups in this country who refer to themselves as such, including the Hells Angels and Pagans. Such clubs want to be left alone to live by their own rules. To his knowledge, the Breed members do not use that term in referring to their club, but it is part of the same subculture. Each club has its own distinctive garb and insignia, worn on clothing and cycles, referred to as their club "colors."

These clubs, including the Breed, establish chapters and territorial areas. The Long Island incident arose out of a territorial dispute between the Hells Angels and Pagans. The "Hell Raisers Ball" was considered an affront to the Pagans' territory. The Pagans "mother club" instigated the incident and drew from its entire membership to carry out the operation. Pagans members travelled to Long Island from as far away as Virginia, including at least one high-ranking member from the vicinity of Asbury Park who is now in custody.

The Hells Angels was founded in the 1950's in Oakland, California, and currently has approximately 2,500 members internationally. It has long been present in New York, and is in the process of starting chapters in Maryland and Philadelphia. There have never been any active chapters of Hells Angels in New Jersey, although some members live here and Clark has been involved in investigating Hells Angels activities in Bergen County, New Jersey in the past.

The Pagans club was founded in 1959 in Prince George's County, Maryland and currently has approximately 600 members in the mid-Atlantic states and in Florida.

Historically, this subculture in Long Island, Maryland, New York and Pennsylvania has been controlled by the Pagans. It also has four chapters in New Jersey: the North Jersey, Elizabeth, Trenton and South Jersey chapters. Although there are no active Pagans chapters in Monmouth County, the last having closed following the shooting of a Pagans member in Union Beach in 1995, there are several active and inactive Pagans members who reside or are active in Monmouth County. Clark estimates that there are approximately 40 to 60 Pagans members currently residing in New Jersey.

The Breed club, founded at some time before 1971, once had chapters throughout New Jersey, New York, Pennsylvania and Ohio. In 1971, the Hells Angels and the Breed engaged in a confrontation similar to the Long Island incident which resulted in the deaths of three Hells Angels and one Pagans member. During the following two decades, the Breed was continuously attacked by the Hells Angels, including a hand grenade attack on the house of the then Breed national president in Plainfield, New Jersey. These attacks led to the Breed shrinking in size from approximately 300 members to approximately 100 members by 1990, in a reduced territory comprised of Bucks County, Pa., and the New Jersey counties of Burlington, Mercer, Middlesex and Monmouth.

The location of Asbury Park, on the central New Jersey coast, has led to both the Breed and the Pagans laying claim to the City as their own, at different times in the past 30 years. Territorial disputes among these various clubs have led to violence in other areas, including a stabbing incident between Breed and Pagans members in Trenton in 1998. Law enforcement authorities are aware that the clubs gather intelligence on their rival clubs.

The recent Long Island incident occurred on Saturday, February 23, 2002. On the following Monday, Detective Clark was assigned by his superiors at the Monmouth County Prosecutor's Office to investigate that incident and to obtain any information that might assist the local police and city officials to assess any risk specifically relevant to the upcoming event in Asbury Park. Over the course of the next few days, the following information was reported to Detective Clark through law enforcement sources which included reliable confidential informants and other local police departments:

- On or about February 28, 2002, a concerned citizen in Long Branch reported to a local police officer that the "word he was hearing" was that there could be some retaliation by Hells Angels against Pagans at this event.

- On March 1, 2002, three Hells Angels members entered a Harley dealership in Highland Park and asked the employees whether any Pagans came there, where they live, and whether that dealership was going to be at this event.

- While the Hells Angels were present in that shop, someone in the shop called a Pagans member, who quickly arrived at the shop in a van with other Pagans, but the Hells Angels had already left.

- The Middlesex County Prosecutors office reports that members of Hells Angels, during the same period, have gone to bars in Sayreville and Old Bridge asking about the whereabouts of Pagans and where they live, and specifically asking whether Pagans are going to go to this event.

- On March 4, members of the Pagans were seen in Asbury Park on the street outside Convention Hall.

Detective Clark explained that the significance of these events, based on his experience, is that this behavior by members of the rival Hells Angels and Pagans clubs is consistent with what happens whenever one of the clubs goes to an event. They gather intelligence about what the other club may be planning, and they go to observe the area where the event will occur.

As to the present likelihood of violence between the Hells Angels and the Pagans, Detective Clark stated that to his knowledge there is no "turf war" between those clubs in New Jersey because the Hells Angels have not as yet tried to establish a presence in this state. However, based upon the Long Island incident and reports from Long Island law enforcement officers who have spoken with the arrestees and others, there definitely will be violence between these two clubs in the form of "retaliation" for that incident. As Clark testified, it is not a matter of "if" but only "when" that retaliation will take place. "Retaliation" in this subculture means that if these clubs are at the same event, they will confront each other and there will be violence. In his opinion, based upon all of this information, it is not only possible but likely that members of the Hells Angels and the Pagans will show up at this event, either visibly or not in their "colors," and if both groups do attend, there will be a violent confrontation. This is despite the fact that the event is not sponsored by either club, and that there is no present information indicating that any Breed members are planning to act out violently at the event.

*The Security Situation*

Captain Thomas McDonald is the acting Chief of the Asbury Park police department, with fifteen years experience in that department. He also testified at the hearing, and the following description is drawn from that testimony and his certification.

The elements of security at large events in the City typically include on-duty and off-duty police and emergency technicians, as well as private non-uniformed security. Event promoters pay for the off-duty officers and the private unarmed security guards. The latter are generally supplied by a bonded security service such as "Peacekeepers." For example, during the first week of December, 2001, there was a week-long Bruce Springsteen event at the Hall which filled the Hall to capacity each day. There were no on-duty police assigned to the event; they were on their regular patrols of the City. The promoters provided 15 off-duty uniformed officers and another 125 bonded security guards, at their expense. The latter have the ability to search people physically and through metal detectors, with greater latitude than the uniformed police officers who are state actors. There was another large musical event called Warped Tour. It was a one-day outdoor event in the hotel lot next to the Hall, and 12,000 tickets were sold in advance. Security for that event was the same as for the Springsteen event. A third similar event was the "Weird Al" show, which drew approximately 1,500 people and had two police officers and 40 security guards provided by the promoters. There was no threat of violence involved in those events, and they went smoothly with no disruption.

There have also been annual summer picnics sponsored by the Breed club in a park in the City. During the past three years each of those events has attracted approximately 500 people, and the club members provided their own security using a temporary enclosure fence. Police observers remained on the outside of the enclosure except on one occasion when a medical emergency developed. At one of

those events, two Pagans members arrived in their "colors." They were asked to remove those features before entering. They complied and entered without incident.

The arrangements for the upcoming event were made in September, 2001 between LCN and the Special Events Coordinator for the City, defendant Charles Rouse. The only security provided in that agreement was that the promoters would hire one off-duty police officer and one off-duty EMS officer. No additional security, either uniformed or private, was required under the agreement or arranged by the promoters. (Maz.)

When Captain McDonald learned of the Long Island incident, information began to reach him from Detective Clark and other law enforcement offices, and he reviewed the security plans for the upcoming event. For example, he also learned that a few days ago in Philadelphia, there was a bombing of a tattoo shop in Philadelphia, the owner of which is believed to be a member of the Pagans.

Captain McDonald testified that the City currently has a total active police force of 65 officers. Those are deployed in eight-person shifts 24 hours each day, with one extra 5 person shift during the night hours. During the times of the upcoming event, from 11 a.m. to 6 p.m., the maximum number of off-duty officers who could be deployed would be 30, unless a "Code Red" emergency developed in which case all 65 officers would have to respond.

The City does not have any "mutual aid" agreements with neighboring towns whereby officers can be obtained. In event of an emergency they can be called. However, according to Captain McDonald each of those towns has its own staffing needs, and he would especially not anticipate getting much emergency assistance over the upcoming St. Patrick's Day weekend.

McDonald compared the security problems associated with the upcoming event with those of "Greekfest" which has occurred in the City in recent years. That occurs on a certain Sunday in July, when by word-of-mouth a large number of young people arrive in the City with no event or organizer of any kind. They have no set time of arriving or leaving, and the numbers are totally unpredictable. There were approximately 10,000 people at last summer's Greekfest. The City made special contractual arrangements for the day with other towns, and at City expense the police complement was approximately 85 officers arranged in several shifts. There were four shootings, including one by a police officer to foil a robbery, and numerous street crimes.

The concern expressed by the City with security for this event includes the likelihood of violence inside the Hall itself, and in the environs both during and after the scheduled times of the event. Captain McDonald testified that it is at events like this that these people congregate, and that is where the trouble is likely to occur. If the event is to go forward, Captain McDonald will deploy all 30 available off-duty officers and will call out every single officer in event of emergency. However, he testified that he has made a careful assessment of what could be done to protect the safety of the participants and the public in connection with this event. It was his recommendation to the City Council that the event be cancelled because in his view the City does not have available adequate security for this event. In his view, even if the City could assemble 85 officers as it did with advance planning for Greekfest, that would not be adequate. Indeed, he testified that even if there were 100 to 125 officers on hand, he could not predict pub-

lic safety with any confidence if people are planning to come to the event with "sinister intentions," as the investigation information suggests. He points out that at the Long Island incident the arrests alone totalled 74 people.

Ms. Mazalatis testified that LCN is committed to working with the City for the safe conduct of this event, and that the City did not invite LCN in to discuss how to increase the security in the wake of the Long Island incident. She said that LCN is willing to hire additional off-duty officers and attempt to hire a private security company. She suggested that the event organizers could also get non-paid persons to help with security. She envisioned that a person could be stationed at each of the emergency fire exits to prevent intruders from being let into the Hall by others in the Hall. However, she acknowledged that LCN has no security expertise available to it, and did not have any of those arrangements in place at the time of this hearing, which was just three days before the opening day of the event. Also, the photos of the exterior of the Hall in evidence at the hearing reveal that the fire and delivery doors are almost too numerous to count. (P-2 through 8.)

*The First Amendment Standards*

■ LCN argues that its promotion of this event constitutes both expressive activity and commercial speech, which are both protected under First Amendment freedom of speech. We agree. The Supreme Court has "cast a fairly wide net in its definition of what comprises expressive activity." *Pi Lambda Phi Fraternity v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir.2000). The right to an expressive association for the purposes of engaging in activities protected by the First Amendment has been repeatedly recognized by the Supreme Court. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct.

2446, 147 L.Ed.2d 554 (2000); *City of Dallas v. Stanglin*, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). And speech which is commercial in nature, and truthful and non-misleading about lawful activities, is also protected. *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); *44 Liquormart v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). The higher standards of protection are attached to expressive association, and as plaintiffs urge we will apply those standards here. However, that does not end our analysis.

■ The Court of Appeals for the Third Circuit has pointed out that the Supreme Court has applied three different levels of scrutiny to state burdens on associational expression, depending on the character of the relationship between the state action and the protected expression. *Pi Lambda Phi*, 229 F.3d at 445. The most rigorous standard of review, that of compelling state interest, is triggered when the state directly burdens expressive rights. That type of effect was seen, for example, when a state law mandated that the group accept members with whom the group did not want to associate. *Id.* at 446. There is an intermediate scrutiny test for regulations that have an "incidental" effect on expression, as when "speech" and "nonspeech" elements are combined in the same course of conduct, a regulation on the "nonspeech" element is an incidental restriction on the "speech" element and thus must meet an intermediate four-part test. *Id.* The third category is where the protected expression is only "indirectly" affected by the state action, because the state action regulates constitutionally unprotected conduct that does not itself contain or manifest protected expression. *Id.*

In those circumstances the Court has held that no First Amendment violation has occurred. *Id.*

■ This Court makes the preliminary finding that the action of the City in cancelling the upcoming event was entirely unrelated to the protected expression of the plaintiffs. We find that the evidence adduced to date shows that the City reneged on its rental agreement with LCN, and thereby cancelled the event, out of real and justified concern for the safety of the public. The City did candidly admit that cost was a factor in its decision, but only a minor one. (McD.) The overriding consideration, as stated by Captain McDonald, was that with the combination of a reasonable expectation of the threat of violent behavior, and a lack of adequate planning and resources to deal with that threat, the City was compelled to cancel the event for safety reasons.

We acknowledge that those cases that have found this third level of standard to be applicable to associational rights have generally involved sanctioned conduct committed by the protected parties themselves, rather than by third parties. For example, in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), the state closed down a bookstore because prostitution was occurring on the premises. Likewise, in *Pi Lambda Phi*, the state university revoked fraternity status after members had engaged in drug activity. 229 F.3d at 446–447. However, in our view the principle is also applicable where, as here, the state acts within its authority to prevent or control unlawful conduct and thereby indirectly affects the associational rights of an affected group,

so long as the state is acting within the scope of its legal authority.

In this situation the City did have the legal right to cancel the rental agreement for the Hall based upon well-founded safety concerns, even if it might later mean having to answer in damages for breach of contract. Therefore, the City's decision to take that course cannot be said to have burdened plaintiff's First Amendment associational rights except indirectly. We therefore conclude as a preliminary matter that no violation of those rights has occurred.[2]

*Procedural Due Process*

Plaintiffs also contend that the City's actions violated their right to procedural due process pursuant to the Fourteenth Amendment. They assert that a legitimate property interest was created when they entered the contract with Asbury Park for the use of the Hall for the event. They also refer to the existence of First Amendment and business interests. Plaintiffs argue that the City failed to provide the necessary procedure because the cancellation of the event occurred without an evidentiary hearing or even the opportunity to be heard.

■ This Court, while agreeing that the contract appears to create a legitimate property interest, concludes at this stage that the plaintiffs have not been denied the process to which they are constitutionally entitled. Fundamentally, procedural due process requires both notice and the meaningful opportunity to be heard. *Hayes v. Reed*, Civil Action No. 96–4941, 1997 WL 125742, at *5 (E.D.Pa. March 13, 1997).

---

2. We would reach the same result if we were analyzing this evidence under the "compelling interest" test for associational rights. We would also reach the same conclusion under the applicable standards for the First Amend-

ment protection of purely commercial speech, for the same reasons expressed here. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001).

In determining the level of process owed, the Court considers:

> First, the private interest that will be affected by the official actions; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest.

*Id.* at *5 (E.D.Pa. March 13, 1997) (citations omitted). In this case, the City actually instituted proceedings in the state court seeking injunctive relief permitting it to cancel the event. The protections provided in this removed state court proceeding, together with the consolidated federal action instituted by plaintiffs, provide more than sufficient notice and an opportunity to be heard to plaintiffs, even given the importance of their interest in the performance of the contract as written and the substantial time and expense they incurred in preparing for the event.

## II. *Irreparable Injury*

 Generally, a party seeking a preliminary injunction must make "a clear showing of immediate irreparable injury." *Hohe v. Casey,* 868 F.2d 69, 72 (3d Cir. 1989). The deprivation of liberties protected by the First Amendment, however, typically constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). "A plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights." *ACLU v. Reno,* 217 F.3d 162, 172 (3d Cir.2000) (citation omitted).

 We have not found that a reasonable probability exists that the actions of the City in cancelling the event were taken in violation of plaintiffs' free speech rights under the First Amendment, or in violation of plaintiffs' rights to procedural due process. Therefore we do not find that plaintiffs have met this prong of the requirements for injunctive relief.

Plaintiff LCN also argues that as a matter of contractual right it should not be subjected to the cancellation of the rental agreement at such a late date, because the calculation of its lost good will is difficult if not impossible to measure. While the Court is cognizant of the major dislocation to LCN's enterprises that the City's decision has caused, we are constrained to observe that even loss of good will can be compensable in an action for money damages, which courts and juries regularly decide in contract litigation.

## III. *Balance of the Hardships*

 In general, a court should consider the possibility of harm to the nonmoving party from the grant of injunctive relief. *Oburn v. Shapp,* 521 F.2d 142, 152 (3d Cir.1975); *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.,* 501 F.2d 917, 924 (3d Cir.1974) ("We believe that when considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other."). The Court must also consider the hardship to any interested third parties. *See, e.g., Oburn,* 521 F.2d at 152. In this case, for the reasons stated above, we find that the balance of the hardships does not favor the grant of an injunction to plaintiffs and does favor permitting the City to cancel the event as it has decided to do. Counsel for the City stated in closing argument that to do otherwise in these circumstances would be a "recipe for disaster," even if the feared confrontation did not erupt. We reluctantly find that the Court is in agreement with balancing the relative hardships so as to favor the City.

## IV. *The Public Interest*

Generally, neither the government nor the public itself can claim an interest in enforcing an unconstitutional governmental action. *See, e.g., ACLU v. Reno,* 217 F.3d 162, 180–81 (3d Cir.2000). The public interest generally favors such constitutional protection even in the face of otherwise important public interests.

This Court has carefully considered the circumstances presented by the competing claims of the parties in this consolidated action, and at this stage in the proceedings we have failed to find any violation of plaintiffs' constitutional rights or any likelihood of irreparable harm in the claimed violation of LCN's contractual rights. Accordingly, we conclude that the public interest in protection from a real likelihood of violence if the event is held must be the factor weighing most heavily in this instance.

## V. *The Bond Requirement*

Federal Rule of Civil Procedure 65(c) generally requires the posting of a security bond. The Court, however, may waive this security requirement. *See, e.g., McCormack v. Township of Clinton,* 872 F.Supp. 1320, 1328 (D.N.J.1994). Here the court must balance the hardship to the defendant if security is required against the hardship to the plaintiffs if it is waived. *See, e.g., Temple Univ. v. White,* 941 F.2d 201, 219 (3d Cir.1991) (citation omitted); *McCormack,* 872 F.Supp. at 1328 (citation omitted).

The City has represented to LCN and to the Court that it will respond to the damages claims asserted by plaintiffs as this litigation moves forward. The City has also offered to refund the $2,800 deposit without need of court action. We expect that the City will promptly make that refund and that the City will be responsible for any monetary relief awarded to plaintiffs in due course. For those reasons, the Court will waive the bond requirement in connection with the order to be entered here.